## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHAN HUE,

    Plaintiff,

    v.

JAMES UPDIKE, et al.,

    Defendants.

:
:
:
:
:
:
:
:
:
:
:

Civil No. 01-CV-1064

(Judge Kane)

(Magistrate Judge Smyser)

## EXHIBITS TO REPLY BRIEF IN SUPPORT OF CORRECTIONS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

EXHIBIT 1:    *Still v. Pennsylvania Department of Corrections*, Civil No. 4:CV-01-2287, *slip op.* (M.D. Pa. September 24, 2002) (Jones, J.).

EXHIBIT 2:    *Stanton v. Meyers*, Civil No. 1:CV-98-1453, *slip op.* a (M.D. Pa. September 26, 2002)(Munley, J.).

EXHIBIT 3:    *Spann v. Wilson*, Civil No. 4: CV-97-1770, *slip op.* (M.D. Pa. September 30, 2002)(Kane, J.).

EXHIBIT 4:    *Lattimore v. Lasky*, Civil No. 4:CV-01-0124, *slip op.* (M.D. Pa. December 2, 2002)(Jones, J.).

EXHIBIT 5:    Page 13 of the Deposition of Phan Hue taken on July 31, 2002, with cover page of Deposition.

EXHIBIT 6:        Unsworn Declaration of Sheila Ridilla.

Respectfully submitted,

Office of General Counsel

BY:  <u>s/ Marsha Mills Davis</u>
     Assistant Counsel
     Attorney I.D. No. 28018
     Department of Corrections
     Office of Chief Counsel
     55 Utley Drive
     Camp Hill PA  17011
     (717) 731-0444

Dated:  April 9, 2003

**EXHIBIT**

1

9/25/62
ep

# UNITED STATES DISTRICT COURT
## FOR THE
### MIDDLE DISTRICT OF PENNSYLVANIA

DARREN STILL,

      Plaintiff

      v.

PENNSYLVANIA DEPARTMENT
OF CORRECTIONS, ET AL.,

      Defendants

      :    CIVIL NO. 4:CV-01-2287

      :    (Judge Jones)

**FILED**
WILLIAMSPORT, PA

SEP 2 4 2002

MARY E. D'ANDREA, CLERK
Per _____
      DEPUTY CLERK

## MEMORANDUM AND ORDER

September 2 4 , 2002

### Background

This <u>pro se</u> civil rights action pursuant to 42 U.S.C. § 1983 was initiated by Darren Still, an inmate presently confined at the Retreat State Correctional Institution, Hunlock Creek, Pennsylvania (SCI-Retreat). Plaintiff's <u>in forma pauperis</u> application was previously construed as a motion to proceed without full prepayment of fees and costs and granted. By Order dated August 7, 2002, this matter was reassigned to the undersigned.

Named as Defendants are the Pennsylvania Department of Corrections (DOC) and three of its officials, Secretary Jeffrey Beard; ex-Secretary Martin Horn; and Chief Grievance Coordinator Thomas James. Still is also proceeding against the following SCI-Retreat officials: Superintendent Edward J. Klem; Deputy Superintendent of Centralized Services Joseph Piazza; Deputy Superintendent for Facilities Management Charles Erickson; Superintendent's Assistant Joseph Lenygel; Health Care Administrator Joseph Mattaloni[1]; Physician's Assistant (PA) James Updyke[2] and Doctor R. T. Diaz.

Still fractured his tibia while playing basketball at SCI-Retreat on December 8, 1999. Following the accident, x-rays were taken by the prison's medical staff and Plaintiff was returned to his cellblock. Those actions were purportedly taken in accordance with a policy developed by Health Care Administrator Mataloni. Plaintiff asserts that approximately four (4) hours later, he was given "a bag of ice and some tylenol." Record document no. 1, ¶ 64. The next day, Still was taken to an outside physician, Doctor Raklewicz, for treatment. His initial claim maintains that the decision to return him to his cell after the taking of x-rays violated his civil rights,

---

[1]    The proper spelling of this name is Mataloni.

[2]    This Defendant indicates that the correct spelling of his name is Updike.

2

because Dr. Raklewicz allegedly stated that sending him back to his cellblock "just made the plaintiff's condition worse." Id. at ¶ 65.

On December 10, 1999, Dr. Raklewicz performed surgery on Still's knee. Upon his return to SCI-Retreat on December 13, 1999, Still was placed in the SCI-Retreat infirmary.   He remained in the infirmary until March 15, 2000.  "On July 31, 2000, Plaintiff wrote a request to Defendant Updyke [sic] concerning pain in the plaintiff's knee and because a knee support was ordered but never given." Id. at ¶ 23. PA Updike responded on August 1, 2000, advising Still to purchase pain medication from the commissary and denying his request for a knee support.  Plaintiff's second claim maintains that Updike's lack of action constituted deliberate indifference to his medical needs.

The complaint next contends that Health Care Administrator Mataloni was deliberately indifferent for overruling a decision by a physical therapist that Still should "go to the gym for therppay [sic] for his knee." Id. at ¶ 70.  He adds that Mataloni denied the request on the basis that the gym was only to be utilized by inmates over the age of forty (40), despite the fact that other inmates were granted permission to use the gym even though they were under forty (40) years of age.

It is also alleged that Updike and Mataloni retaliated against Still by clearing him to return to work and doctoring medical reports.  These retaliatory acts

3

were purportedly taken in response to Plaintiff's submission of numerous grievances against those Defendants and resulted in unwarranted "misconducts, segregation and constant harassment." Id. at ¶ 73.

With respect to Dr. Diaz, the Plaintiff generally contends that on October 10, 2001, he wrote to Diaz "concerning his medical care." Id. at ¶ 55. The next day Sill acknowledges that he received a reply from Diaz telling him to sign up for sick call. Plaintiff's final claim is that the remaining Defendants, Secretary Beard, ex-Secretary Horn and Chief Grievance Coordinator James, failed to grant him relief on administrative grievances which he filed regarding the above allegations. His complaint seeks compensatory and punitive damages.

On February 14, 2002, Defendants DOC, Beard, Horn, Klem, Piazza, Erickson, James, Lengyel and Mataloni, collectively referred to as the Corrections Defendants filed a motion seeking dismissal of the complaint for both failure to exhaust administrative remedies and for failure to state a claim upon which relief may be granted. See Record document no. 10. Thereafter, remaining Defendants Updike and Diaz filed a similar motion to dismiss. See Record document no. 13. Both motions have been briefed and are ripe for consideration.

**Discussion**

4

A court, in rendering a decision on a motion to dismiss, must accept the veracity of the plaintiff's allegations.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); White v. Napoleon, 897 F.2d 103, 106 (3d Cir. 1990).  In Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996), our Court of Appeals for the Third Circuit added that when considering a motion to dismiss based on a failure to state a claim argument, a court should "not inquire whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims."  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

"The test in reviewing a motion to dismiss for failure to state a claim is whether, under any reasonable reading of the pleadings, plaintiff may be entitled to relief."  Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993) (citation omitted).  Additionally, a court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them."  Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990); Independent Enters., Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1168 (3d Cir. 1997).  Finally, it is additionally well-settled that pro se complaints should be liberally construed.  Haines v. Kerner, 404 U.S. 519, 520 (1972).  This court will now discuss Defendants'

5

respective motions in light of the standards set forth above and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**Updike and Diaz**

PA Updike and Dr. Diaz's motion to dismiss asserts that: (1) Plaintiff failed to comply with the exhaustion of administrative remedies requirement and (2) the complaint fails to sufficiently allege that either Updike or Diaz were deliberately indifferent to a serious medical need. The moving Defendants initially argue that "Still has not indicated in his complaint that he has exhausted all of his available administrative remedies." Record document no. 15, ¶ IV(A). They add that the grievances which were submitted by Plaintiff did not seek monetary relief. Furthermore, there is no indication that any grievance was ever filed with respect to the allegations asserted against Dr. Diaz.

42 U.S.C. § 1997e(a) provides as follows:

> No action shall be brought with respect to prison conditions under Section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Section 1997e(a) requires administrative exhaustion "irrespective of the forms of relief sought and offered through administrative avenues." Porter v. Nussle, 122

6

S.Ct. 983, 992 (2002); <u>Booth v. Churner</u>, 532 U.S. 731, 741 n. 6 (2001).  Claims for

monetary relief are not excused from the exhaustion requirement.  <u>Nyhuis v. Reno</u>,

204 F.3d 65, 74 (3d Cir. 2000).  Dismissal of an inmate's claim is appropriate when a

prisoner has failed to exhaust his available administrative remedies before bringing a

civil rights action.  <u>Ahmed v. Sromovski</u>, 103 F. Supp. 2d 838, 843 (E.D. Pa. 2000).

"[E]xhaustion must occur prior to filing suit, not while the suit is pending."  <u>Tribe v.</u>

<u>Harvey</u>, 248 F.3d 1152, 2000 WL 167468, *2 (6th Cir. 2000)(citing <u>Freeman v.</u>

<u>Francis</u>, 196 F.3d 641, 645 (6th Cir. 1999)).

    An inmate's failure to comply with the administrative exhaustion

requirement constitutes an affirmative defense.  <u>See</u> e.g., <u>Massey v. Helman</u>, 196 F.3d

727, 735 (7th Cir. 2000), <u>cert. denied</u>, 532 U.S. 1065 (2001); <u>Jenkins v. Haubert</u>, 179

F.3d 19, 29 (2d Cir. 1999); <u>Robinson v. Dalton</u>, 107 F.3d 1018, 1021 (3d Cir.

1997)(holding, in the context of a Title VII case, that failure to exhaust administrative

remedies is an affirmative defense).  Consequently, a prisoner does not have to allege

in his complaint that he has exhausted administrative remedies.  <u>Ray v. Kertes</u>, 285

F.3d 287 (3d Cir. 2002).  Rather, it is the burden of a defendant asserting the defense

to plead and prove it.  <u>Id.</u>; <u>Williams v. Runyon</u>,130 F.3d  568, 573 (3d Cir. 1997);

<u>Charpentier v. Godsil</u>, 937 F.2d 859 (3d Cir. 1991); Fed. R. Civ. P. 8(c).

7

The Pennsylvania Department of Corrections has a Consolidated Inmate Grievance Review System. DC-ADM 804 (effective January 1, 2001). With certain exceptions not applicable here, DC-ADM 804, Section VI ("Procedures") provides that, after attempted informal resolution of the problem, a written grievance may be submitted to the Grievance Coordinator; an appeal from the Coordinator's decision may be made in writing to the Facility Manager or Community Corrections Regional Director; and a final written appeal may be presented to the Secretary's Office of Inmate Grievances and Appeals.

A prisoner, in seeking review through the grievance system, may include requests for "compensation or other legal relief normally available from a court." (DC-ADM 804-4, issued April 29, 1998.) Furthermore, [g]rievances must be submitted for initial review to the Facility/Regional grievance Coordinator within fifteen (15) days after the events upon which the claims are based," but allowances of extensions of time for good cause, "will normally be granted if the events complained of would state a claim of a violation of a federal right." Id.

With respect to Dr. Diaz, the motion to dismiss notes that there is no indication that the Plaintiff filed any administrative grievance regarding the conduct of said Defendant. Still's opposing brief to the motion to dismiss likewise offers no evidence that he ever initiated an administrative grievance against Dr. Diaz.

8

Consequently, pursuant to the requirements of § 1997e(a), Diaz is entitled to an entry of dismissal.[3]

In response to PA Updike's failure to exhaust argument, Still has submitted a copy of a grievance (RET 0256-00) dated July 31, 2000, wherein he contended that Updike acted improperly by telling him to obtain pain medication from the commissary and denying his request for a knee support.[4]   See Record document no. 21, Exhibit B.  Plaintiff also filed a grievance, (RET 0252-00), regarding his lack of eligibility to attend therapy in the over 40 gym.[5]  A thorough review of those grievances reveals that neither specifically sought monetary compensation.  Appeals from the denial of both grievances were denied by Grievance Coordinator Lengyel,

---

[3]  It is additionally noted that there are no allegations set forth in the complaint which would support a claim that Dr. Diaz was deliberately indifferent to the Plaintiff's medical needs.  Specifically, the complaint alleges only that Diaz promptly responded to Still's request for medical care by telling him to sign up for sick call.

[4]  In addition, this claim of deliberate indifference is undermined by a copy of an August 16, 2000 reply to grievance RET 0256-00, which was submitted by Plaintiff in opposition to the motion to dismiss.  The reply states that "[a]ccording to your consultation with the physical therapist, a brace was not indicated for your treatment."  Record document no. 21, Exhibit B.

[5]  Still acknowledges that he was granted leave to attend an over 40 physical fitness class on July 13, 2001.  See id. at Exhibit E.

9

Superintendent Klem, the DOC's Chief Hearing Examiner, and Chief Grievance Coordinator James.

The Plaintiff also filed and exhausted a grievance , (RET 0327-00) on October 10, 2000, which alleged that Updike and Mataloni had medically cleared him to return to work without further examination of his knee, See id. at Exhibit C.[6]  This grievance likewise did not ask for monetary relief.  However, a review of the record provides no indication that Still ever filed a grievance which alleged retaliation or that PA Updike had altered his medical reports.  Consequently, those claims are subject to dismissal under § 1997e(a).

The moving Defendants argue that Still's complaint must be dismissed because he did not seek monetary compensation through the administrative process.  In support, they rely upon Geisler v. Hoffman, No. 99-1971 (3d Cir. Sept. 29, 2000), an unpublished opinion from the Third Circuit.  In Geisler, the Third Circuit did rule that an inmate's claim for monetary relief was barred because he had not sought such relief in the administrative process.

---

[6]   A submission by the Plaintiff establishes that as of October 26, 2000, Dr. Diaz determined that he was not medically cleared for kitchen work.  See id. at Exhibit C.

10

Two learned members of this Court, relying upon <u>Geisler</u>, have held that an inmate plaintiff's failure to seek monetary damages via a prison grievance procedure precluded the prisoner from pursuing such relief under § 1983.  See <u>Laird v. Pennsylvania Department of Corrections</u>, Civil No. 3:CV-00-1039, slip op. at 3 (M.D. Pa. Sept. 26, 2001) (Nealon, J.); <u>Chimenti v. Kimber</u>, Civil No. 3:CV-01-273, slip op. at 11 (M.D. Pa.  March 15, 2002)(Vanaskie C.J.).  This Court agrees with the determinations announced in <u>Geisler</u>, <u>Laird</u>, and <u>Chimenti</u>, and likewise concludes that an inmate's failure to seek monetary relief when such a remedy is available through an available prison grievance procedure precludes him from subsequently obtaining such relief in a civil rights action.[7]

Still's present complaint seeks only compensatory and punitive damages.  However, as noted above, he did not include a request for monetary damages in his administrative grievances.  Thus, Plaintiff's claims against PA Updike which were administratively exhausted within the DOC are nonetheless foreclosed as a

---

[7]  This Court recognizes that a recent, post-<u>Geisler</u> decision rendered by Judge Caldwell of this Court reached the contrary conclusion that failure to seek a specific monetary remedy within an institutional grievance by itself was not an adequate basis for dismissal under § 1997e(a).  <u>Woods v. Beard</u>, Civil No. 1:CV-01-2249, slip op. at 7-9  (M.D. Pa.  Sept 3, 2002)(Caldwell, J.).

11

consequence of the failure of his grievances to seek monetary relief.  Updike's

request for dismissal will also be granted.

## Corrections Defendants

The Corrections Defendants argue that they are entitled to an entry of

dismissal on the bases that: (1) the DOC is not a person for purposes of § 1983; (2)

Plaintiff has not alleged that he has exhausted his available administrative remedies;

(3) the claims against Beard and Horn are premised on a theory of respondeat

superior; (4) a valid claim of deliberate indifference has not been stated; and (5)

Plaintiff has not set forth a cognizable claim of retaliation against Defendant

Mataloni; and (6) they are entitled to qualified immunity.

The Corrections Defendants initially argue that the DOC is not a properly

named defendant.  With  regards to this issue, it is well-settled that a plaintiff, in order

to state a viable § 1983 claim, must plead two essential elements:  1) that the conduct

complained of was committed by a person acting under color of state law, and 2) that

said conduct deprived the plaintiff of a right, privilege, or immunity secured by the

Constitution or laws of the United States.  West v. Atkins, 487 U.S. 42, 48 (1988);

Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995).

The United States Supreme Court has ruled that a § 1983 action brought

against a "State and its Board of Corrections is barred by the Eleventh Amendment

12

unless [the State] has consented to the filing of such a suit." <u>Alabama v. Pugh</u>, 438

U.S. 781, 782 (1978).  The United States Court of Appeals for the Third Circuit

similarly concluded that the Pennsylvania Board of Probation and Parole could not be

sued because "it is not a 'person' within the meaning of Section 1983." <u>Thompson v.</u>

<u>Burke</u>, 556 F.2d 231, 232 (3d Cir. 1977).

In <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58 (1989), the Supreme

Court reiterated its position that state agencies are not "persons" subject to liability in

§ 1983 actions brought in federal court.  The Court noted that a § 1983 suit against a

state official's office was "no different from a suit against the State itself." <u>Id.</u> at 71.

"<u>Will</u> establishes that the State and arms of the State, which have traditionally

enjoyed Eleventh Amendment immunity, are not subject to suit under § 1983 in either

federal or state court." <u>Howlett v. Rose</u>, 496 U.S. 356, 365 (1990).

After <u>Will</u>, our Court of Appeals held that in determining whether a state

agency is entitled to Eleventh Amendment immunity, a federal court should consider:

whether the state would be responsible for the payment of any judgment rendered

against the agency; the source of the agency's funding; and the degree of autonomy

enjoyed by the agency, as well as other similar factors. <u>Bolden v. Southeastern</u>

<u>Pennsylvania Transp. Auth.</u>, 953 F.2d 807, 818 (3d Cir. 1991).

13

In the instant case, payment of any judgment rendered against the DOC would have to be paid out of the Pennsylvania state treasury. Furthermore, that Defendant receives all of its funding from the state and does not enjoy any measure of autonomy. Therefore, it is clear under <u>Will</u> and <u>Bolden</u> that the DOC is not a "person" for the purpose of § 1983 and, therefore, not a properly named defendant.

With respect to the exhaustion argument, it is noted that the Plaintiff initially asserts that his transfer back to his cellblock after the taking of x-rays constituted deliberate indifference by prison officials. Second, Still contends that the Corrections Defendants also violated the Eighth Amendment by failing to grant him relief with respect to his various administrative grievances. Furthermore, his complaint also alleges that Health Care Administrator Mataloni violated his civil rights by denying him needed physical therapy, and by subjecting him to retaliatory treatment, i.e., altering his medical records and clearing him to return to institutional employment.

On March 27, 2000, Plaintiff filed a grievance asserting that it was improper for prison officials to return him to his cellblock pending the outcome of his December 8, 1999 x-rays and that there was a delay before he was even provided with an ice pack and Tylenol. Although the submitted copy of this grievance is not completely legible, it appears that Still requested to "be compensated." Record

14

document no. 21, Exhibit A, p. 2. The grievance was rejected as being untimely on May 17, 2000. An appeal of the rejection was filed with the Chief Hearing Examiner. Consequently, this Court will accept Still's contention that he properly exhausted his administrative remedies with respect to this claim.

The Plaintiff filed and fully exhausted a grievance, RET 0252-00 regarding his lack of eligibility for the over 40 gym. See Record doc. no. 21, Exhibit C. It is again noted that Plaintiff has submitted a document indicating that he was eventually administratively approved to participate in a over 40 fitness class on July 13, 2001. See id. at Exhibit E. Another grievance, RET 0327-00, initiated by Still alleged that Defendant Mataloni had acted improperly by clearing him to work in the prison kitchen. See id. at Exhibit C. As previously discussed, documents submitted by Plaintiff indicate that Dr. Diaz issued a determination on or about October 26, 2000 that Still was not medically cleared to begin employment in the kitchen.

There is no indication that a grievance alleging that Mataloni altered Still's medical records was ever pursued. Hence, said claim is subject to dismissal under § 1997e(a). Furthermore, a review of the grievances which were filed provides that they did not seek monetary relief. Thus, under Geisler, Laird, and Chimenti, this Court is foreclosed from considering Plaintiff's claims for compensatory and punitive

15

damages stemming from Defendant Mataloni's alleged retaliation, failure to admit

Plaintiff to the over 40 gym, and decision to clear him for institutional employment.[8]

The Corrections Defendants next argue that the claims against Secretary

Beard and ex-Secretary Horn are solely based on those officials' supervisory

capacities within the DOC.  Claims brought under § 1983 cannot be premised on a

theory of <u>respondeat superior</u>.  <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir.

1988).  Rather, each named defendant must be shown, via the complaint's allegations,

to have been personally involved in the events or occurrences which underlie a claim.

---

[8]   In addition, the complaint fails to assert a viable claim of retaliation
against Heath Care Administrator Mataloni.  A claim of retaliation by government
officials against an inmate for exercising his First Amendment right to register a
complaint regarding prison policies is sufficient to set forth a § 1983 claim.  <u>Newsom
v. Norris</u>, 888 F.2d 371, 376-77 (6th Cir. 1989).  Mere conclusory allegations of
retaliation may safely be dismissed.  <u>Flaherty v. Coughlin</u>, 713 F.2d 10, 13 (2d Cir.
1983).  Only complaints which allege "facts giving rise to a colorable suspicion of
retaliation may proceed." <u>Id</u>.
     In an unreported opinion, the Third Circuit Court of Appeals held that "[t]o
prevail on a claim of retaliation, the prisoner must demonstrate that the prison
authorities engaged in retaliatory action, and that the action did not advance
legitimate goals of the correctional institution or was not tailored narrowly enough to
achieve such goals."  <u>Brooks-Bey v. Kross</u>, C.A. No. 94-7650, slip op. at 8 n. 14 (3d
Cir. (Pa.), July 24, 1995) (Becker, C.J.), slip opinion at 7-8, citing <u>Rizzo v. Dawson</u>,
778 F.2d 527, 532 (9th Cir. 1985).  This Court's review of the complaint establishes
that there are no facts alleged which support a retaliation claim against Health Care
Administrator Mataloni.  Plaintiff's conclusory allegations of retaliatory conduct by
said Defendant are constitutionally insufficient.

16

See <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976); <u>Hampton v. Holmesburg Prison Officials</u>, 546 F.2d 1077 (3d Cir. 1976). As explained in <u>Rode</u>:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

<u>Rode</u>, 845 F.2d at 1207.

Based on this Court's review of the complaint, there are no alleged facts which would establish that Superintendents Horn and Beard had any personal involvement or acquiescence in either the treatment of Still at SCI-Retreat or the administrative review of his grievances. Since it is apparent that the claims against those Defendants are solely based on their supervisory capacities within the DOC, under the standards announced in <u>Capone</u> and <u>Rode</u>, they are both entitled to an entry of dismissal.

The Corrections Defendants next argue that the Plaintiff has not stated a viable claim of deliberate indifference. As recognized in <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), the government has an "obligation to provide medical care for those whom it is punishing by incarceration." <u>Id.</u> at 103. A constitutional violation, however, does not arise unless there is "deliberate indifference to serious medical needs of

17

prisoners" which constitutes "unnecessary and wanton infliction of pain." Id. at 104 (citation omitted). The proper analysis for deliberate indifference is whether a prison official "acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 841 (1994).

Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment [as] medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. Where a prisoner has actually been provided with medical treatment, one cannot always conclude that, if such treatment was inadequate, it was no more than mere negligence. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993). It is true, however, that if inadequate treatment results simply from an error in medical judgment, there is no constitutional violation. See id.

The Court of Appeals for the Third Circuit in Durmer established that a non-physician defendant cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints when he is already receiving treatment by the prison's medical staff. Likewise, a prison health care administrator "cannot be deliberately indifferent when an inmate is receiving care from a doctor." Thomas v. Zinkel, 155 F.Supp. 2d 408, 413 ( E.D. Pa. 2001).

18

None of the Corrections Defendants is identified as being a physician. Furthermore, the record of this action clearly demonstrates that following his accident, the Plaintiff was placed under the care of the prison's medical staff and was referred to Dr. Raklewicz the following day. There are no facts alleged which would show that the return of Still to his cellblock after the taking of x-rays was contrary to a medical directive or prescribed course of treatment. Consequently, under the standards discussed in <u>Durmer</u> and <u>Thomas</u>, the remaining Corrections Defendants, who are all non-physicians, are entitled to an entry of dismissal with respect to Still's sole, exhausted claim of being improperly returned to his cellblock.

It is additionally noted that the mere fact that some Corrections Defendants responded to Still's grievances does not support an inference that they were deliberately indifferent to his medical needs.[9] Those officials were entitled to rely upon the advice of the health care professionals. There are simply no allegations that

---

[9]    Moreover, there is no constitutional right to a grievance procedure. <u>See</u> <u>Jones v. North Carolina Prisoners' Labor Union, Inc.</u>, 443 U.S. 119, 137-38 (1977)(Burger, C.J., concurring)("I do not suggest that the [grievance] procedures are constitutionally mandated."). Accordingly, to the extent Plaintiff contends that the Corrections Defendants violated his constitutional rights by not taking corrective action on his medical complaints, said allegations fail to state a claim upon which relief may be granted. <u>See</u> <u>Johnson v. Harding</u>, Civil No. 3:CV-99-977, slip op. at p. 8 (Feb. 29, 2000)(Vanaskie, C.J.).

19

any of the Corrections Defendants improperly interfered with the health care professionals or adversely influenced the care and treatment Still received.

In conclusion, under the standards announced in <u>Durmer</u> and <u>Thomas</u>, there is no basis for an Eighth Amendment claim against any of the Corrections Defendants. Pursuant to the above discussion, the Corrections Defendants' motion to dismiss will be granted.  An appropriate Order will enter.[10]

**IT IS HEREBY ORDERED THAT:**

1. Defendants James Updike, P.A. and Renato Diaz, M.D.'s motion to dismiss (Record document no. 13) is granted.

2. The Corrections Defendants' motion to dismiss (record document no. 10) is granted.

3. Plaintiff's motion for default judgment (Record document no. 24) is denied.

4. The Clerk of Court is directed to close the case.

---

[10] In light of the conclusions announced herein, a discussion as to the merits of the Corrections Defendants' qualified immunity argument is not required.

20

5.    Any appeal from this Order will be deemed frivolous, without

probable cause and not taken in good faith.

JOHN E. JONES III
United States District Judge

21

EXHIBIT

tabbies

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRYAN EUGENE STANTON, SR.,
    Plaintiff

      v.

ROBERT W. MEYERS, ET AL.,
    Defendants

:
:
:
:
:
:
:

Civil No. 1:CV-98-1453

(Judge Munley)

FILED
SCRANTON

SEP 2 6 2002

PER _____
DEPUTY CLERK

## MEMORANDUM

This matter proceeds on an amended civil rights complaint (Doc. 41) filed by appointed counsel on behalf of Bryan Eugene Stanton ("Stanton"), an inmate formerly confined at the State Correctional Institution, Bellefonte, Pennsylvania ("SCI-Rockview). Before the court for disposition are the Defendants' motions for summary judgment. (Docs. 83 and 87). The motions have been fully briefed and are ripe for disposition. For the reasons set forth below, the motions will be granted.

### Background

The remaining defendants named in the amended complaint, all employed at SCI-Rockview at the times relevant to this action, and their respective positions, are identified as follows: Robert W. Meyers ("Meyers"), Superintendent and, between 1994-1997, Major of the Guards; Daniel Harter ("Harter"), Inmate Program Manager; Steven Morningstar ("Morningstar"), Unit Building Manager for Building "D"; and, Corrections Officers Captain, Sergeant Kenneth Roan ("Roan"), and Edward Mowery ("Mowery"). In the

amended complaint, Stanton alleges that between 1993 and 1997 he was housed in Building A at SCI-Rockview and "was nicknamed 'Cowboy,' because of Plaintiff's preference for country music." (Doc. 41, Am. Complaint. ¶ 16). During this time, unnamed correctional officers began calling him "Cowgirl," in person and over the public address system despite the fact that he was never caught in a homosexual act or otherwise provided them with any reason to believe that he was a homosexual. (*Id.* ¶ ¶ 17-19). According to Stanton, this resulted in his gaining the false reputation of being homosexual; being involved in confrontations with other inmates; "being called names such as faggot, queer, homo;" caused other inmates to avoid him; and caused him anxiety, fear and distress as homosexuals are "not looked upon favorably by the general prison population." (*Id.* ¶ 20). By 1997, the situation became intolerable and he requested a transfer, which resulted in his being moved to Building D. (*Id.* ¶ ¶ 21-22). However, in time, the guards and other inmates from Building A were also transferred throughout the prison and the nickname "Cowgirl" went with them, so that Stanton is now called "Cowgirl" everywhere he goes and it is presumed he is a homosexual and is subjected to the previously noted treatment. (*Id.* ¶ 23).

Stanton asserts that on March 7, 1998, he was assigned to cell 339 on level #3 in Building D with inmate William Saltsman. (*Id.* ¶ 24). According to Stanton the two cellmates had never met and did not know each other. At the time, Stanton had less than four years to serve on his maximum sentence and Saltsman was serving a life sentence with

2

a consecutive term to run thereafter for the execution style murder of his armed robbery victim. According to Stanton, Harter, and Morningstar were responsible for cell assignments and were aware of "Saltsman's violent nature." (*Id.* ¶¶ 27-28).

On the day Stanton moved to cell 339, Saltsman purportedly questioned him about his reputation of being a homosexual. Further, Saltsman told Stanton that as a result of his sexuality, Stanton could not remain in the cell with Saltsman and refused to believe that Stanton was not gay. (*Id.* ¶¶ 28-29). At that time, Saltsman also told Stanton that he, Saltsman, had written three inmate request slips which all stated that they had just moved Stanton into his cell and that Stanton was a known homosexual and that as such he was not safe in Saltsman's cell and that there can be no compatibility or tolerance of Stanton's lifestyle. Stanton asserts that the three request slips were sent to Defendants Meyers, Morningstar, and Roan. Meyers is purported to have responded to these request slips by stating that he spoke with defendants Morningstar and Harter regarding the matter and that "... they should take care of inmate Saltsman's problem." (*Id.* ¶ 34). Further, Stanton alleges that at no time after Saltsman submitted his three request slips was he warned by Meyers, Morningstar, Harter, or Roan of the possible danger he was in nor was he asked if he felt threatened or wanted protective custody nor did any of those Defendants place Saltsman in confinement, move him to another cell or admonish him not to harm plaintiff.

3

On March 20, 1998, at approximately midnight, two unnamed correctional officers made their hourly rounds of the cells in Building D. (*Id.* ¶ 42). Shortly thereafter, Stanton, who was in his bunk watching television, was struck in the face by Saltsman, who then ordered Stanton to stick out his hands. (*Id.* ¶ 44). At first, he put out his hands but then, afraid of what would happen, pulled them back and Saltsman then purportedly pulled him off the bunk by his shirt, ripping the shirt. (*Id.*). Next, Saltsman is alleged to have slashed the left side of Stanton's face with a razor blade, making a five inch long cut. (*Id.*). Stanton states that because of this attack, he was afraid and decided to comply with Saltsman's orders. (*Id.*). Stanton was ordered to keep quite and get on his knees at the front of the cell and put his hands behind his back. (*Id.*). Saltsman tied Stanton's hands behind his back and, with his inmate boots on, began to kick him in the back while pacing the floor and talking to himself.

The Plaintiff alleges that the assault lasted for approximately an hour and fifteen minutes before Defendant Mowery made rounds and found Stanton on the cell floor being kicked by Saltsman. According to Plaintiff, Saltsman told Mowery to "'get this piece of shit out of my cell'" (*Id.* ¶¶ 44-46), to which Mowery replied okay, calm down, and, having made rounds alone and without a walkie talkie, started leaving to get help. (*Id.* ¶¶ 46-48). In response to Mowery's actions, Stanton states he begged him not to leave and to get him [Stanton] out of the cell. (*Id.* ¶ 48). Saltsman continued to kick Stanton until several

4

corrections officers came, ordered Saltsman to the back of the cell, and dragged Stanton out of the cell. (*Id.* ¶ 49).

Stanton states that as a result of the assault he suffered a severe facial cut requiring numerous stitches, a substantial loss of blood, severe pain, and injury to his back. (*Id.* ¶ 50). He contends he was treated for his injuries first at the Centre County Hospital and then spent approximately four days in the prison medical treatment building. (*Id.*).

When Stanton was released from the medical treatment building he was placed in protective custody for a few days. He returned to the general population on March 26, 1998. (*Id.* ¶ 51). The following day, on March 27, 1998, while Stanton was retrieving his property from the property trailer, an inmate named Johnnie Greeley told him that "around March 15-17, 1998, Greeley was standing outside of Morningstar's office where he overheard an argument between Morningstar and Saltsman which involved Saltsman's complaint about Plaintiff and Saltsman's request to move Plaintiff out of Saltsman's cell. Greeley overheard Morningstar tell Saltsman to 'do what you gotta do,' which only served to encourage Saltsman to assault Stanton." (*Id.* ¶ 38).

Based on the foregoing, Stanton contends that the Defendants failed to adequately protect him against assault by Saltsman in violation of his Eighth Amendment right to be free from cruel and unusual punishment as well as his Fourteenth Amendment substantive due process rights.

5

### I. Summary judgment standard.

A motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph*, 842 F.2d 689, 693-694 (3d Cir. 1988) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed2d 202 (1986)).

The burden of proving that there is no genuine issue of material fact is initially upon the movant. *Forms, Inc. v. American Standard, Inc.*, 546 F. Supp. 314, 320 (E.D. Pa. 1982), *aff'd mem.* 725 F.2d 667 (3d Cir. 1983). Upon such a showing, the burden shifts to the nonmoving party. *Id.* The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir. 1988). In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id., quoting Gans v.*

6

*Mundy*, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88

L.Ed.2d 467 (1985); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)

*cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

## II. Discussion.

The basis of the Defendants' motions for summary judgment is that the Plaintiff

failed to exhaustion his administrative remedies.  The law provides as follows: "No action

shall be brought with respect to prison conditions under section 1983 of this title, or any

other Federal law, by a prisoner confined in any jail, prison, or other correctional facility

until such administrative remedies as are available are exhausted."  42 U.S.C. §1997e(a); *see*

*Booth v. Churner*, 532 U.S. 731 (2001).   The Supreme Court has made clear that prisoners

must exhaust administrative remedies as to any claim that arises in the prison setting,

regardless of any limitations on the kind of relief that may be gained through a grievance

process.  *See Porter v. Nussle*, 122 S.Ct. 983, 992 (2002)("we hold that the PLRA's

exhaustion requirement applies to all inmate suits about prison life, whether they involve

general circumstances or particular episodes, and whether they allege excessive force or

some other wrong."); *Booth v. Churner*, 121 S.Ct. 1819, 1825 n. 6 (2001)("we hold ... that

Congress has provided in § 1997e(a) that an inmate must exhaust [administrative remedies]

irrespective of the forms of relief sought and offered through administrative avenues.).

Thus, prisoners are required to exhaust available administrative remedies prior to seeking

7

relief pursuant to § 1983 or any other federal law. The Third Circuit Court of Appeals has

concluded that "it is beyond the power of this court...to excuse compliance with the

exhaustion requirement." *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000). However,

compliance with the administrative remedy scheme will be satisfactory if it is substantial. *Id.*

at 77-78.

The Pennsylvania Department of Corrections provides an administrative grievance

system that requires inmates to file formal written grievances following unsuccessful

informal resolution of a problem.  If an inmate is dissatisfied with the initial review

response, the inmate may appeal to the facility manager. (Doc. 85, Exhibit C, Declaration of

Chief Hearing Examiner Bitner, p. 2 ¶ 3).  The next step in the review process, that was in

effect at that time, was an appeal to final review with the Office of the Chief Hearing

Examiner.  (*Id.* at ¶ 4).

The Defendants argue that the Plaintiff has failed to fully exhaust his

administrative remedies in that he did not properly utilize the appeal procedure with regard

to seeking final review. On March 24, 1998, the Plaintiff filed an initial grievance

complaining of the March 7, 1998, incident, which was assigned grievance number "ROC-

259-98." (Doc. 85, Exhibit "C1a").  The Initial Review Response to the grievance was

unsatisfactory (*Id.* at Exhibit "C1b"), so, on April 19, 1998, the Plaintiff appealed the

grievance. (*Id.* at Exhibit "C1c").  Therein, he states that he wishes to "file charges on Mr.

8

Saltsman and desire to su (sic) the State Police. I wish to keep this inside our institution."
(*Id.*). The appeal was denied on April 20, 1998, and he was instructed to contact Captain
Tressler to obtain the information on the Pennsylvania State Police. (*Id.* at Exhibit "C1d").
He was further advised to write to the Pennsylvania State Police and report the incident.

On May 28, 1998, the Plaintiff sent a letter inquiring about the status of his final
appeal. He represents therein that he sent his appeal on grievance number 259-98 to the
State Correctional Institution at Camp Hill and expected to receive a response within twenty-
one (21) days but, twenty-five (25) days had passed and he had heard nothing. He further
states that he sent an eight (8) page letter explaining what happened to him and why he was
filing the grievance. (*Id.* at Exhibit "C1e"). In the eight (8) page letter, the Plaintiff details
the incident at issue and complains that "know (sic) one is doing anything to help me file
charges, see the state police, see the district attorney." (Doc. 85, Exhibit D, p. 6 of
Plaintiff's April 27, 1998 letter). He further states that "[s]ince my attack, I feel that I have
not been treated fairly, the proper help that I require to speak with the state police, District
Attn (sic), and a lawyer, has not been provided to me. And most of all, I feel that this
institution is triing (sic) to cover this serious crime up by keeping it inside the walls of this
Institution. I would like some kind of help in this matter even if its only a phone call to this
Institution telling them to do something, or a phone call to the state police Mr Sasserman...."
(*Id.* at p. 8).

On June 12, 1998, Chief Hearing Examiner Robert S. Bitner, responded to the Plaintiff stating "[t]his is to acknowledge receipt of your appeal to final review of the above numbered grievance ["ROC-0259-98"]." (*Id.* at "C1f"). He further stated that he has reviewed the entire record of the grievance, including the initial grievance, the Grievance Officer's response, the appeal from initial review and the Superintendent's response. He also carefully reviewed the issues the Plaintiff raised to final review. (*Id.*) He concluded by informing the Plaintiff that he concurred with the responses provided at the institution level and that denial of final review was appropriate. (*Id.*)

Further, in response to the eight (8) page letter, J. Harvey Bell, Bureau of Inmate Services informed the Plaintiff that it was his responsibility to contact the state police and the district attorney. "It is not incumbent upon the administration at the institution to assist in this process." (Doc. 85, Exhibit D).

Although it is clear from the above that the Plaintiff did appeal grievance "ROC-0259-98" to final review, it is equally clear that the Plaintiff did not satisfy the exhaustion requirement in that the issues raised in the grievance and the relief sought through the grievance procedure are wholly different than the issues raised in the Plaintiff's civil rights claim. As noted by the Defendants, the focus of the Plaintiff's grievance was the fact that his cellmate had assaulted him and he needed help in contacting the district attorney's office

10

and the state police to press charges against the cellmate. Stanton's grievance does not seek any relief with regard to the named Defendants.

In addition, his failure to request monetary and equitable relief during the administrative process is fatal to his claim. On the issue of equitable relief, as stated earlier, an inmate must exhaust administrative remedies irrespective of the forms of relief sought and offered through administrative avenues. The Plaintiff did not seek any equitable relief as to the named Defendants. As concerns, monetary relief, the Defendants raise this issue and, in doing so, rely on the case of *Geisler v. Hoffman*, No. 99-1971, slip op. (3d Cir. Sept. 29, 2000), an unreported/ unprecedential Third Circuit Court of Appeals Memorandum. This very Court reviewed the *Geisler* case in an earlier decision, *Knight v. Horn*, Civil No. 3:CV-00-1717 (M.D.Pa. December 27, 2001)(Munley, J.) and, while recognizing that the matter could be persuasive authority for this Court to follow, found that the facts were not sufficiently recited so as to enable the Court to determine whether *Geisler* could apply to the facts of the case under consideration. We therefore revisit *Geisler* by applying it to the facts of the present case.

The Court stated in *Geisler*: "And, we note, Geisler's grievances sought relief wholly different from the monetary remedy that he subsequently sought from the District Court. To this end, even if Geisler had brought his grievances before the two appellate tiers provided for by DC-ADM 804, exhaustion in that setting clearly would not have exhausted

11

his current claim for monetary relief, a claim which he never began to pursue administratively." *Geisler, supra*, at 5. This is similar to the situation we are faced with here. Unlike Geisler, the Plaintiff did exhaust to final review. However, his claims and relief sought at the administrative level are wholly different from the claims and relief he seeks here.

The Plaintiff did not request any monetary relief at the administrative level. Effective May 1, 1998, the Department of Corrections amended DC-ADM 804 to provide that a prisoner, in seeking review through the grievance system, may include requests for "any claims concerning violations of Department of Corrections directives, regulations, court orders, or other laws." DC-ADM 804-4 issued April 29, 1998. The Plaintiff argues that he was not required to request such relief because it was not available at the time he filed his grievance. However, according to the Defendants, the monetary relief amendment provided: "[i]nmates who have not already completed final review may request compensation or legal relief on appeal to final review." DC-ADM 804-4, effective May 1, 1998. The letter denying the Plaintiff relief was issued on June 12, 1998, 42 days after the May 1, 1998 amendments. He would therefore fall into the category of "inmates who have not already completed final review" and was eligible to amend his grievance to include a claim for monetary relief. Stanton never included a request for monetary damages. Nor did he request an extension of time to amend his grievance to include a claim for monetary

12

relief. (Doc. 85, Exhibit C, Unsworn Declaration of Robert S. Bitner, Chief Hearing
Examiner, p. 6, ¶ 10g).

Three members of this Court, relying upon *Geisler* have held that an inmate
plaintiff's failure to seek monetary damages *via* the prison grievance procedure precluded
the prisoner from pursuing such relief under § 1983. *See Thomas v. Meyers*, Civil No.
3:CV-00-1887 (M.D.Pa. March 25, 2002)(Caputo, J.)); *Chimenti v. Kimber*, Civil No. 3:CV-
01-0273, slip op. at 11 (M.D. Pa. March 15, 2002(Vanaskie, C.J.)); *Laird v. Pennsylvania
Department of Corrections*, Civil No. 3:CV-00-1039, slip op. at 3 (M.D. Pa. Sept. 26, 2001
(Nealon,J.)). Stanton did not include a request for monetary damages in his administrative
complaint. Thus, Plaintiff's claim against the defendants for monetary relief is foreclosed as
a consequence of his failure to seek such relief through the DOC grievance process.
Accordingly, Defendants' motions for summary judgment will be granted.

The Defendants' motions for summary judgment will therefore be granted as the
Plaintiff has failed to exhaust his administrative remedies with respect to the claims raised in
his amended complaint.

An appropriate order follows.

13

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRYAN EUGENE STANTON, SR.,    :    Civil No. 1:CV-98-1453
     Plaintiff    :
         :    (Judge Munley)    **FILED**
         :    **SCRANTON**
     v.    :
         :    SEP 2 6 2002
ROBERT W. MEYERS, ET AL.,    :
     Defendants    :    PER_____

## O R D E R

AND NOW, to wit, this 26ᵗʰ day of September, 2002, it is hereby **ORDERED** that:

1. The Defendants' motions for summary judgment (Docs. 83 and 87) are **GRANTED**;

2. The Clerk of Court is directed to **CLOSE** this case.

3. Any appeal from this Order will be deemed frivolous, lacking in probable cause and not in good faith.

**JUDGE JAMES M. MUNLEY**
**United States District Court**

**EXHIBIT**

tabbies

3

10-1-0?

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

ANTOINE SPANN,                    :
                                  :
            Plaintiff             :
                                  :
      v.                          :        CIVIL NO. 4:CV-97-1770
                                  :
HARRY E. WILSON, ET AL.,          :        (Judge Kane)        **FILED**
                                  :                            **HARRISBURG**
            Defendants            :
                                           SEP 3 0 2002

                                           MARY E. D'ANDREA, CLERK
            **M E M O R A N D U M**        Per_____
                                                   DEPUTY CLERK

**Background**

        Antoine Spann, an inmate presently confined at the
State Correctional Institution, Somerset, ("SCI-Somerset"),
Pennsylvania, initiated the above-captioned civil rights
complaint pursuant to 42 U.S.C. § 1983.    Plaintiff was
previously granted leave to proceed in forma pauperis.

        Named as Defendants are the following officials at
Spann's former place of incarceration, the Retreat State
Correctional Institution Hunlock Creek, Pennsylvania (SCI-
Retreat): Superintendent Harry Wilson, Deputy Superintendents
Joseph Piazza and Thomas Lavan; Inmate Program Manager John
Mack; Major William Biggs; Captain Wilde; Sergeant Randy
Caswell; Unit Manager Joseph Bufalino; and Counselors William
Marcinkowski and Jill Shepler.   Plaintiff is also proceeding

against Harvey Bell and Robert Bitner of the Pennsylvania Department of Corrections (DOC).

By order dated March 10, 1998, Spann was notified that he could submit an amended complaint as a matter of right and defendants' motion to dismiss the original complaint was denied as moot. Spann thereafter filed an amended complaint which basically reiterated the allegations set forth in his original complaint. Defendants responded by filing a motion to dismiss the amended complaint. By Memorandum and Order dated February 14, 2000, the motion to dismiss was granted with respect to defendants Joseph Bufalino, Jill Shepler, Robert Bitner and Harvey Bell. All claims against the remaining eight defendants were dismissed except for plaintiff's claim that defendants failed to protect plaintiff's safety.

Presently pending before the court is defendants' motion for summary judgment. (Doc. No. 77). This motion has been fully briefed and is ripe for disposition.

In their motion for summary judgment, defendants contend, inter alia, that they are entitled to judgment as a matter of law because Spann has not exhausted his claim for monetary relief. Because plaintiff's claims against the

2

defendants for monetary relief are foreclosed as a consequence

of his failure to seek such relief through the Department of

Corrections ("DOC") grievance process, the motion will be

granted.

## Discussion

Summary judgment is appropriate when supporting

materials, such as affidavits and other documentation, show

there are no material issues of fact to be resolved, and the

moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56.  The Supreme Court has ruled that Fed. R. Civ.

56(c) "mandates the entry of summary judgment, after adequate

time for discovery and upon motion, against a party who fails

to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that

party will bear the burden of proof at trial."  Celotex Corp

v. Catrett, 477 U.S. 317 (1986).  The court further stated

that "Rule 56 (e). . .requires the non-moving party to go

beyond the pleadings and by [his] own affidavits, or by the

'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a

genuine issue for trial.'"  Id. at 324.  The Supreme Court in

Anderson v. Liberty Lobby, 477 U.S. 242 (1986), has held that

3

the opposing party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. See Celotex, 477 U.S. at 325. Further, an opposing party cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit. Liberty Lobby, 477 U.S. at 256-57.

With these principles in mind, the Court will first set forth the allegations in the complaint and then the materials submitted by the defendants to attempt to demonstrate that defendants are entitled to judgment.

Plaintiff alleges that during a one-week period in 1996, he was assaulted on two occasions while employed in the prison laundry by fellow inmate John Monroe. He maintains that the attacks resulted from Monroe's belief that Plaintiff was an informant. A few weeks later, Spann states that he was attacked by another unidentified inmate in the prison's compound as part of an extortion scheme. Plaintiff was issued a misconduct as a result of the incident and served a thirty (30) day period in the prison's Restricted Housing Unit (RHU). Despite his objections, he was returned to general population upon completion of his disciplinary term. When the extortion

4

immediately restarted, Spann purportedly contacted both his
block counselor Marcinkowski and Captain Wilde regarding
Monroe and the ongoing extortion.    However, his amended
complaint alleges that those Defendants failed to take
immediate action.    He does acknowledge that Wilde later had
him placed in the RHU for his own protection.

While    in    the    RHU,    Plaintiff    was    informed    by
Defendants Piazza, Lavan and Mack during an appearance before
a Program Review Committee (PRC) that a request for his
transfer had been submitted to the DOC's central office.    The
request for transfer was denied and despite his objections, he
was later returned to general population by the PRC.    Spann
states upon reentering general population, Monroe "immediately
bombarded" him and the extortion started once again.    (Doc.
No. 1, Exhibit A, page 2.)    During November, 1996, Plaintiff
maintains that he approached Deputy Superintendent Lavan
regarding his fears, but the Defendant refused to listen and
instead    had    him    issued    a    misconduct    for    being    in    an
unauthorized area.    After serving another thirty (30) day term
in the RHU, and despite his wishes to the contrary, Spann was
again returned to general population and was subjected to
additional    extortion    for    the    next    two    and    one-half    (2½)

5

months.

Spann next alleges that because of constant stress
caused by the above events, he developed undisclosed physical
problems which resulted in his placement in the prison
infirmary on two (2) occasions in January - February, 1997.
However, he contends that Major Biggs forced him to
prematurely leave the infirmary during his initial stay until
his treating physician arranged for his return.  Later during
1997, Captain Wilde allegedly rejected Plaintiff's request to
be replaced in the RHU for his own protection.  On March 21,
1997, Spann maintains that although they were purportedly on
separation status, he was placed in an RHU cell with Monroe
for the next four and one-half (4½) months.  During this
period, and despite many requests for assistance from prison
officials, Monroe purportedly assaulted Plaintiff on three (3)
separate occasions.

As a result of one of the assaults, Spann had a
filling knocked out and another tooth cracked.  His amended
complaint also asserts that his being double celled with
Monroe clearly constituted failure to protect and was an act
of "overt racial aggression and official oppression."  (Doc.

6

No. 16, ¶ 2.)   He seeks injunctive relief[1], specifically a transfer and damages for pain and suffering.

To pierce these allegations, the defendants have submitted a statement of material facts, (Doc. No. 78) supported by extensive documentation and affidavits, (Doc. No. 79), which indicate that Spann was incarcerated at SCI-Retreat from April 6, 1994 until his transfer to SCI-Smithfield on July 1998.   On July 30, 1999, Spann was transferred to SCI-Somerset.

In June, 1996, Spann was placed in Administrative Custody because he incurred gambling debts and feared for his safety.  At his July 24, 1996 monthly meeting with the Program Review Committee (PRC), plaintiff was informed that before they could initiate a transfer, the PRC needed to know the names of the inmates who threatened him.  Plaintiff identified John Monroe and Sylvester Rone as the inmates.  A separation from these inmates was then entered into the system.

On September 6, 1996, Unit Manager, Jill Shepler,

---

1.   In this Court's Order of February 14, 2000, Spann's request for injunctive relief (a transfer) was deemed moot. See Wahl v. McIver, 773 F.2d 1169, 1173 (11th Cir. 1985)(absent class certification, an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred).

7

prepared a vote sheet for an institutional transfer on the basis of the need for the separation. This vote sheet was prepared and signed by, among others, defendants Piazza, Lavan, and Wilson. Defendant Wilson disapproved the transfer because he was "not convinced this is not manipulation for a transfer as opposed to a legitimate separation need". (Doc. No. 79, Exhibit I).

On December 20, 1996, plaintiff was released to general population. He remained there until March 12, 1997, at which time he requested self-confinement in the RHU. Id. at Exhibit J. From March 12, 1997 through March 20, 1997, Spann was housed in RHU Cell 104. From March 20, 1997 through August 6, 1997, Spann was celled with inmate John Monroe in RHU Cell 206. During this time, although Spann attended monthly meetings with the PRC, he never once complained of having any problems with inmate Monroe.

Following Spann's August 6, 1997 monthly meeting with the PRC, the PRC noted from Spann's file that he had been double celled with Monroe and that Spann had previously had a separation from Monroe. Based on this separation, the PRC removed Spann from Cell 206 and placed him in RHU Cell FA111.

This same day, plaintiff filed grievance No. RET-

8

0291-97 which states the following:

> On March 21, 1997, I was moved into a
> double cell with an inmate who I'm suppose
> to have been separated form (sic) because
> I was in fear of my safe (sic). Which the
> RHU Sargent know about (Sgt. Caswell) and
> the member of the PRC who are the ones who
> put me on the separation last year. They
> kept me in the cell with this inmate
> (Johnny Monroe) for 4½ months, which I had
> to fight on three different days while I
> was in the cell with him. Doing (sic)
> those fights I had my filling knock out of
> one tooth and another tooth crack. Which
> both had to be removed or repaired. I was
> left in that cell in fear for all those
> months. Knowing if I said anything what I
> would have to fight this inmate again.
>
> I saw PRC today and they mention this
> inmate and that we still had a separation
> between us. I told them they knew that I
> was put in the cell with this inmate down
> in the RHU knowing we had a separation
> between us. Now today after having to
> fight this guy three times, and being
> locked in the cell with him for 4½ months
> they get around to moving me out because of
> the separation. Why did it take so long
> for them to do something about the problem
> when they know form (sic) day one.

(Doc. No. 79, Exhibit G, Official Inmate Grievance).

Plaintiff's grievance was received on August 13, 1997

and responded to with the following:

> This Grievance was referred to Deputy Lavan,
> designated Grievance Officer for this type of
> Grievance.
>
> Deputy Lavan reports that he had Captain

9

> Wilde look into your situation. In June,
> 1996, you identified two inmates who
> threatened you. Based on PRC notes at the
> time, a separation was entered into the
> system. You and the other inmates were all
> in General Population without incident. The
> separation should have been removed. You
> were in the same cell with Inmate Monroe
> for about 4½ months without any
> substantiated incident. Captain Wilde
> checked with Doctor Grabiec who extracted
> your tooth on 7/22/97. The x-ray was
> reexamined and Doctor Grabiec said the
> tooth was extracted because it was decayed,
> not because it was cracked. As soon as you
> told staff about your separation from
> Monroe, you were placed in another cell.
> Since you did not bring up any problems
> before this, Deputy Lavan finds no grounds
> for your Grievance.

(Doc. No 79, Exhibit G, Official Inmate Grievance Initial
Review Response).

On August 22, 1997, Plaintiff filed an appeal of the
Grievance to Superintendent Wilson. By response dated August
28, 1997, Superintendent Wilson denied the appeal stating the
following:

> I have reviewed your initial grievance, the
> response provided for by the Grievance
> Coordinator, and your appeal at this level.
>
> In is unclear to me what you are attempting
> to accomplish via this appeal. PRC has
> already moved you away from inmate Monroe.
> I do not believe they intentionally left
> you double celled with Monroe if a
> separation was in place.

10

> You had the opportunity to meet PRC every
> four weeks and should have at one of those
> meetings discussed your concern. As stated
> in your initial appeal response, when PRC
> became aware of the separation, they moved
> you immediately.

> Based on the rationale cited above, appeal denied.

(Doc. No. 79, Exhibit G, Response to Grievance Appeal).

On September 5, 1997, Spann filed an appeal of
Superintendent Wilson's denial to the Office of the
Commissioner. (Doc. No. 79, Exhibit G, copy of appeal).

By letter dated October 14, 1997, Spann was notified
by Commission Horn of the following:

> Your request for appeal to final review of
> the above noted grievance is hereby
> acknowledged.

> In accordance with the provisions of DC-ADM
> 804, I appointed the following panel of
> three (3) to serve as the Central Office
> Review Committee (CORC): Robert S. Bitner,
> Chief, Hearing Examiner Division, J. Harvey
> Bell, Pardons Case Specialist; and a
> Department staff attorney.

> This Committee has reviewed Grievance No.
> RET-0291-97 and all documents related to
> your appeal at the institutional level and
> this office.

> After a careful evaluation of this
> grievance, it is the recommendation of the
> CORC that the action taken by staff at the
> institutional level be upheld. The CORC
> finds the issues raised for final review
> have been addressed by the grievance

11

> coordinator and the Superintendent, and
> their responses are reasonable and
> appropriate. The CORC fully agrees with
> the responses already provided.
>
> I concur with the findings of the CORC, and
> the Superintendent shall notify all
> individuals involved in this matter.

(Doc. No. 79, Exhibit G, letter).

It is undisputed that Spann followed the Department's administrative grievance procedure. Defendants, however, argue that Spann's complaint must be dismissed because he did not seek monetary compensation through the administrative process.[2] In support, they rely upon <u>Geisler v. Hoffman</u>, No.

_____

2. 42 U.S.C. § 1997e(a) provides as follows:

> No action shall be brought with respect to
> prison conditions under Section 1979 of the
> Revised Statutes of the United States (42
> U.S.C. § 1983), or any other federal law,
> by a prisoner confined in any jail, prison,
> or other correctional facility until such
> administrative remedies as are available
> are exhausted.

Section 1997e(a) requires administrative exhaustion "irrespective of the forms of relief sought and offered through administrative avenues." <u>Booth v. Churner</u>, 532 U.S. 731, 741 n.6 (2001). Claims for monetary relief are not excused from the exhaustion requirement. <u>Nyhuis v. Reno</u>, 204 F.3d 65, 74 (3d Cir. 2000). Dismissal of an inmate's claim is appropriate when prisoner has failed to exhaust his available administrative remedies before bringing a civil rights action. <u>Ahmed v. Sromovski</u>, 103 F. Supp. 2d 838, 843 (E.D. Pa. 2000). "[E]xhaustion must occur prior to filing suit, not while the
(continued...)

99-1971 (3d Cir. Sept. 29, 2000), an unpublished opinion from the Third Circuit.

In <u>Geisler</u>, the United States Court of Appeals for the Third Circuit upheld the dismissal of the complaint of plaintiff, an inmate, against a private physician, Stanley Hoffman, M.D., based on 42 U.S.C. § 1983, solely because of the failure of the plaintiff to exhaust his administrative remedies provided for by DC-ADM 804.[3] The Court of Appeals

---

2. (...continued)
suit is pending." <u>Tribe v. Harvey</u>, 248 F.3d 1152, 2000 WL 167468, *2(6th Cir. 2000)(citing <u>Freeman v. Francis</u>, 196 F.3d 641, 645 (6th Cir. 1999)).

3. With certain exceptions not applicable here, DC-ADM 804, Section VI ("Procedures") provides that, after attempted informal resolution of the problem, a written grievance may be submitted to the Grievance Coordinator; an appeal from the Coordinator's decision may be made in writing to the Facility Manager or Community Corrections Regional Director; and a final written appeal may be presented to the Secretary's Office of Inmate Grievances and Appeals.
Effective May 1, 1998, the Department of Corrections amended DC-ADM 804 to provide that a prisoner, in seeking review through the grievance system, may include requests for "compensation or other legal relief normally available from a court." (DC-ADM 804-4, issued April 29, 1998.) Further, the amendment requires that the [g]rievances must be submitted for initial review to the Facility/Regional grievance Coordinator within fifteen (15) days after the events upon which the claims are based," but allows for extensions of time for good cause, which "will normally be granted if the events complained of would state a claim of a violation of a federal right." <u>Id</u>.

13

concluded that Geisler did not exhaust. "To this end, even if Geisler had brought his grievances before the two appellate tiers provided for by DC-ADM 804, exhaustion in that setting clearly would not have exhausted his current claim for monetary relief, a claim which he never even began to pursue administratively." Id., slip op. at 4.

Two learned members of this Court, relying upon Geisler have held that an inmate plaintiff's failure to seek monetary damages via the prison grievance procedure precluded the prisoner from pursuing such relief under § 1983. See Laird v. Pennsylvania Department of Corrections, Civil No. 3:CV-00-1039, slip op. at 3 (M.D. Pa. Sept. 26, 2001 (Nealon,J.)); Chimenti v. Kimber, Civil No. 3:CV-01-0273, slip op. at 11 (M.D. Pa. March 15, 2002(Vanaskie, C.J.)).

Spann did not include a request for monetary damages in his administrative complaint. Thus, plaintiff's claim against the defendants for monetary relief is foreclosed as a consequence of his failure to seek such relief through the DOC grievance process.

14

Accordingly, defendants' motion for summary judgment will be granted  An appropriate order is attached.

16

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

**FILED**
**HARRISBURG**

SEP 3 0 2002

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

ANTOINE SPANN,                    :

        Plaintiff          :

        v.                 :          CIVIL NO. 4:CV-97-1770

HARRY E. WILSON, ET AL.,          :          (Judge Kane)

        Defendants          :

## ORDER

NOW, THEREFORE, THIS *30th* DAY OF *Sept*,
2002, for the reasons set forth in the foregoing Memorandum,
**IT IS HEREBY ORDERED THAT:**

    1.   Defendants' motion for summary judgment, (Doc.
No. 77), is granted.   Judgment is hereby
entered in favor of the defendants and against
plaintiff.

    2.   The Clerk of Court shall close this case.

    3.   Any appeal taken from this order will be deemed
frivolous, without probable cause, and not
taken in good faith.

_____
YVETTE KANE
United States District Judge

**EXHIBIT**

tabbies

4

# UNITED STATES DISTRICT COURT
## FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT M. LATTIMORE, JR.,　　　　　:

　　　　　　Plaintiff　　　　　　　　　:　　　No. 4:CV-01-0124

vs.　　　　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　　　　　:　　　(Judge Jones)

MARTIN LASKY, M.D., et al.,　　　　　:
　　　　　　Defendants　　　　　　　　:

FILED
WILLIAMSPORT, PA

DEC　2 2002

## **MEMORANDUM**

### Background

Plaintiff, an inmate formerly confined at the State Correctional Institution, Camp Hill, Pennsylvania[1], ("SCI-Camp-Hill"), filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that defendants were deliberately indifferent to his serious medical condition. Plaintiff's in forma pauperis application was previously construed as a motion to proceed without full prepayment of fees and costs and granted. By Order dated August 12, 2002, this matter was reassigned to the undersigned.

Lattimore names as defendants the following individuals: Martin Lasky, a physician at SCI-Camp Hill; Martin Dragovich, Superintendent at SCI-Camp Hill;

---

1. By letter to the court filed October 31, 2002, plaintiff notified the court that his present address is 2012 N. 4th Street, Harrisburg, Pa 17104. (Doc. No. 83).

Teresa Law, Health Care Administrator at SCI-Camp Hill; and Keith Weigle, an employee of Wexford Health Services, Inc[2].

The plaintiff states that he has been confined at SCI-Camp Hill since February 9, 2000. During this time period plaintiff was receiving chemo-therapy treatment for Hodgkin's Disease. He claims that "on or about June 6, 2000, he requested to stop his treatment due to serious personal as well as family problems". (Doc. No. 1, complaint).

On July 15, 2000, the plaintiff met with Dr. Lasky and requested to finish chemo-therapy treatment. On August 9, 2000, plaintiff was to be seen by Dr. Scott, Barnes, the oncologist who had been treating him. He was instead examined by Dr. Jennifer Cadiz. Dr. Cadiz performed a physical examination on plaintiff and informed him that everything was fine, "but that it was imperative that [he] have all of his following treatments as scheduled". Plaintiff received chemo-therapy on this visit and treatments were scheduled for every two weeks thereafter. Id.

Lattimore claims that for a seven week period, from August 9, 2000 until September 26, 2000, he did not receive any type of treatment for his cancer. He

---

2. Since September, 1996, Wexford Health Sources, Inc., has been the contracted medical provider at SCI-Camp Hill, to provide medical services to inmates of the facility, including utilization review and case management.

states that on September 12, 2000, he "spoke to Nurse Melissa, who called someone and then informed plaintiff that he would be going out for treatment by the end of that week". Id. On September 18, 2000, plaintiff wrote to Teresa Law, Health Care Administrator, explaining that he was "suffering from cancer and was not receiving his prescribed chemo-therapy treatments and was very concerned that [his] condition was worsening." Plaintiff claims to have not received "any type of reply". Id.

On September 22, 2000, plaintiff "informed Mr. Ward, Unit Manager of B-Block, of the situation as well as the steps plaintiff had already taken to get help". Mr. Ward stated that he had "no control over medical and supplied plaintiff with a grievance form". Id. On September 25, 2000, plaintiff filed a grievance against the medical department, inquiring as to the reason for the delay of treatment.

On September 26, 2000, plaintiff was seen by Dr. Barnes. Plaintiff asked Dr. Barnes about the delay in his treatment. Plaintiff claims that Dr. Barnes stated that he had "personally called Dr. Lasky at SCI-Camp Hill about plaintiff not coming for treatment" and that "Dr. Lasky informed him that the reason plaintiff was not coming for treatment was because plaintiff was no longer an inmate at SCI-Camp Hill." Id. Dr. Barnes then conducted a physical examination of the plaintiff which "revealed suspicious lumps under plaintiff's skin on the left side of the neck and in the left

3

underarm pit". Dr. Barnes "immediately stopped chemo-therapy and ordered a CAT scan of plaintiff's neck and chest." He also "showed plaintiff a letter from Dr. Jennifer Cadiz which was sent to SCI-Camp Hill, stating that plaintiff was to be returned for further treatment two (2) weeks after previous chemo-therapy on or about 8-9-00". Id.

On October 6, 2000, plaintiff was called to the medical department to speak with Dr. Lasky concerning plaintiff's grievance. Dr. Lasky allegedly stated that plaintiff's grievance "was bullshit and that the plaintiff was not the only sick, prisoner at SCI-Camp Hill." Id. He could not "give plaintiff any reasonable purpose for the delay/interference of plaintiff's prescribed treatment". Id.

On October 10, 2000, plaintiff returned to Dr. Barnes' office for the result of the CAT scan. The scan confirmed that there were some lumps in plaintiff's neck and chest. Dr. Barnes ordered a biopsy of these lumps. Id.

On October 13, 2000, plaintiff received an answer from Dr. Lasky in reference to plaintiff's grievance. Plaintiff states that "Dr. Lasky's answer was what happened on or about 6-6-00 (plaintiff requested to stop treatments) but offered no reason for the approx. 7 week delay/interference of plaintiff's treatment, which is what plaintiff was grievancing (sic)". Id.

4

On October 16, plaintiff filed an appeal to Superintendent Dragovich, informing him that he was "suffering from cancer and was not receiving treatment for approx. 7 weeks and was very concerned." Lattimore "also informed Superintendent Dragovich of the steps and numerous ways plaintiff had tried to rectify the situation, as well as that Dr. Lasky's answer to plaintiff's grievance was incorrect as to the dates of plaintiff's treatment and did not given any reason for the delay/interference of plaintiff's treatment". Id.

On October 20, 2000, plaintiff received an answer to his grievance from Superintendent Dragovich, in which he claims that Dragovich "upheld Dr. Lasky's answer and used that to base his answer". He offered no other reason for the delay in plaintiff's treatment.

On October 26, 2000, plaintiff filed a final appeal with the Chief Hearing Examiner. On November 23, 2000, plaintiff's appeal was denied. Id.

As of January 11, 2001, plaintiff claims that he had not received the "prescribed test to determine the exact nature of the lumps on plaintiff's neck and under arm". He states that he was seen twice by a radiologist in December, who "informed plaintiff that he believes plaintiff's condition has worsened due to the delay/interference in plaintiff's treatment".

5

On January 19, 2001, Lattimore filed the instant action in which he claims that defendant Weigle's failure to "schedule plaintiff's treatments as prescribed, caused the plaintiff unnecessary mental and physical pain and anguish". He further alleges that Superintendent Dragovich is legally responsible for the well being of all the prisoners at SCI-Camp Hill, and that his "failure to fully investigate plaintiff's claims that his subordinates were not fulfilling their duty, allowed plaintiff to continue needless physical and mental pain and anguish". For relief, plaintiff seeks compensatory and punitive damages, as well as injunctive relief.

Presently pending before the court are defendants' motions for summary judgment. (Doc. Nos. 70 & 75). These motions have been fully briefed and are ripe for disposition. In their motion for summary judgment, defendants Lasky and Weigle contend, inter alia, that they are entitled to judgment as a matter of law because Lattimore has not exhausted his claim for monetary relief. Because plaintiff's claims against the defendants for monetary relief are foreclosed as a consequence of his failure to seek such relief through the Department of Corrections ("DOC") grievance process, and because all defendants are entitled to judgment as a matter of law, for the reasons discussed below, the motions will be granted.

**Discussion**

6

### A. Standard of Review

Summary judgment is appropriate when supporting materials, such as affidavits and other documentation, show there are no material issues of fact to be resolved, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The Supreme Court has ruled that Fed. R. Civ. 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp v. Catrett, 477 U.S. 317 (1986). The court further stated that "Rule 56 (e). . .requires the non-moving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. The Supreme Court in Anderson v. Liberty Lobby, 477 U.S. 242 (1986), has held that the opposing party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. See Celotex, 477 U.S. at 325. Further, an opposing party cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit. Liberty Lobby, 477 U.S. at 256-57.

7

Defendants Lasky and Weigle assert that they are entitled to judgment as a matter of law on the ground that Lattimore did not adequately exhaust administrative remedies. Further, all of the moving defendants argue that they are entitled to judgment as a matter of law because the plaintiff has failed to set forth a valid claim of deliberate indifference to a serious medical need.

**B. Exhaustion of Administrative Remedies**

It is undisputed that Lattimore followed the Department's administrative grievance procedure. (See Doc. No. 78, copies of inmate grievances filed by plaintiff). Defendants Lasky and Weigle, however, argue that Lattimore's complaint must be dismissed because he did not seek monetary compensation through the administrative process.[3] In support, they rely upon Geisler v. Hoffman, No. 99-1971

---

3. 42 U.S.C. § 1997e(a) provides as follows:

> No action shall be brought with respect to prison conditions under Section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Section 1997e(a) requires administrative exhaustion "irrespective of the forms of relief sought and offered through administrative avenues." Booth v. Churner, 532 U.S. 731, 741 n.6 (2001). Claims for monetary relief are not excused from the exhaustion requirement. Nyhuis v. Reno, 204 F.3d 65, 74 (3d Cir. 2000). Dismissal of an inmate's claim is appropriate when prisoner has failed to exhaust his available administrative remedies before bringing a civil rights action. Ahmed v. Sromovski,

8

(3d Cir. Sept. 29, 2000), an unpublished opinion from the Third Circuit.

In Geisler, the United States Court of Appeals for the Third Circuit upheld the dismissal of the complaint of plaintiff, an inmate, against a private physician, Stanley Hoffman, M.D., based on 42 U.S.C. § 1983, solely because of the failure of the plaintiff to exhaust his administrative remedies provided for by DC-ADM 804.[4] The Court of Appeals concluded that Geisler did not exhaust. "To this end, even if Geisler had brought his grievances before the two appellate tiers provided for by DC-

---

103 F. Supp. 2d 838, 843 (E.D. Pa. 2000). "[E]xhaustion must occur prior to filing suit, not while the suit is pending." Tribe v. Harvey, 248 F.3d 1152, 2000 WL 167468, *2(6th Cir. 2000)(citing Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999)).

4. With certain exceptions not applicable here, DC-ADM 804, Section VI ("Procedures") provides that, after attempted informal resolution of the problem, a written grievance may be submitted to the Grievance Coordinator; an appeal from the Coordinator's decision may be made in writing to the Facility Manager or Community Corrections Regional Director; and a final written appeal may be presented to the Secretary's Office of Inmate Grievances and Appeals.
Effective May 1, 1998, the Department of Corrections amended DC-ADM 804 to provide that a prisoner, in seeking review through the grievance system, may include requests for "compensation or other legal relief normally available from a court." (DC-ADM 804-4, issued April 29, 1998.) Further, the amendment requires that the [g]rievances must be submitted for initial review to the Facility/Regional grievance Coordinator within fifteen (15) days after the events upon which the claims are based," but allows for extensions of time for good cause, which "will normally be granted if the events complained of would state a claim of a violation of a federal right." Id.

ADM 804, exhaustion in that setting clearly would not have exhausted his current claim for monetary relief, a claim which he never even began to pursue administratively." Id., slip op. at 4.

This Court, relying upon Geisler, has held that an inmate plaintiff's failure to seek monetary damages via the prison grievance procedure precludes the prisoner from pursuing such relief under § 1983. See Still v. Pennsylvania Department of Corrections, Civil No. 4:CV-01-2287, slip op. at 11 (M.D. Pa. Sept. 24, 2002 (Jones, J.)). See also, Spann v. Wilson, Civil No. 4:CV-99-1770, slip op. at 14 (M.D. Pa. Sept. 30, 2002 (Kane, J.)) ; Thomas v. Meyers, et al., Civil No. 3:CV-00-1887, slip op. at 15 (M.D. Pa. March 25, 2002(Caputo, J.)); Chimenti v. Kimber, Civil No. 3:CV-01-0273, slip op. at 11 (M.D. Pa. March 15, 2002(Vanaskie, C.J.)); Laird v. Pennsylvania Department of Corrections, Civil No. 3:CV-00-1039, slip op. at 3 (M.D. Pa. Sept. 26, 2001 (Nealon,J.)).

Lattimore did not include a request for monetary damages in his administrative complaint. Thus, plaintiff's claim against the defendants for monetary relief is foreclosed as a consequence of his failure to seek such relief through the DOC grievance process.

In his brief in opposition, plaintiff attempts to argue that he need not exhaust

10

"specifically with respect to each item of relief he seeks", so long as he has substantially complied with the administrative remedy process.   (Doc. No. 82, opposition brief at p. 4).   Even if the exhaustion requirement had been satisfied as to any of the defendants, however, Lattimore has not presented a viable claim against them.

### C. Deliberate Indifference

The fundamental principles of Eighth Amendment analysis reveal that "only 'the unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment forbidden by [that Amendment][5]." Ingraham v. Wright, 430 U.S. 651, 670 (1977) (citations omitted). Accord Whitley v. Albers, 475 U.S. 312, 319 (1986). Mere negligence or dissatisfaction with medical care does not state a constitutional claim. Estelle v. Gamble, 429 U.S. 97, 105-6 (1976).  An Eighth Amendment claim exists only when there is a deliberate indifference to a serious medical need.  Id.; West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978).

To establish deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health or safety. Farmer v. Brennan, 511 U.S. 825, 837 (1994); Wilson v. Seiter, 501 U.S. 294, 299(1991).  "[T]he official must

---

5. The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

11

both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837.   "The question ... is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" <u>Id</u>., at 843.

Under <u>Farmer</u>, 511 U.S. at 837, Lattimore must prove that the defendants knew that their conduct presented a substantial risk of harm to him. Where an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist. <u>Nottingham v. Peoria</u>, 709 F.Supp. 542, 547 (M.D.Pa. 1988).  Disagreement among individuals as to the proper medical treatment does not support an Eighth Amendment claim.  <u>Monmouth County Correctional Inst. Inmates v. Lensario</u>, 834 F.2d 326, 346 (3d Cir. 1987).

It is undisputed that plaintiff received medical care.[6] Defendants Lasky and

---

6.  Neither Superintendent, Martin L. Dragovich, nor Corrections Health Care Administrator, Teresa M. Law is a physician.  The United States Court of Appeals for the Third Circuit in <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 69 (3d Cir. 1993) established that a non-physician defendant cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints when he is already receiving treatment by the prison's medical staff. Likewise, a prison health care administrator "cannot be deliberately indifferent when an inmate is receiving care from a doctor. <u>Thomas v. Zinkel</u>, 155 F. Supp. 2d 408, 413 (E.D. Pa. 2001).

12

Weigle[7] have submitted a statement of material facts, (Doc. No. 76) supported by

extensive documentation and Dr. Lasky's own affidavit, (Doc. No. 78), which

indicate that on or about February 9, 2000, plaintiff was incarcerated at SCI-Camp

Hill.  During a previous incarceration at Dauphin County prison, Lattimore was

diagnosed with Hodgkin's disease. Dr. Al-Mondhiry, his treating oncologist in April

1999, prescribed six full cycles of chemotherapy, which would consist of twelve

biweekly treatments. (Doc. No. 78, Exhibit A, Declaration of Martin Lasky, D.O.

, ¶ 11).  Following his discharge from Dauphin County Prison, Lattimore received

chemotherapy on August 16, 1999, October 25, 1999 and January 27, 2000, at

Hershey Medical Center, but he missed several other appointments for his

chemotherapy. Id. at ¶ 12.

Following his commitment to SCI-Camp Hill, plaintiff was referred to

Hematology and Medical Oncology Associates, P.C. for chemotherapy treatments

on February 25, 2000, April 3, 2000, April 28, 2000 and May 19, 2000. Id. at 13.

On April 4, 2000, a CT Scan of the chest was performed because there was no

---

7. Defendant, Keith Weigle is responsible for scheduling plaintiff's trips for medical
treatment by outside facilities and/or providers. Plaintiff acknowledges that he has
had no discussions with Keith Weigle and admits that he never made any requests
for treatment which were refused by Keith Weigle. (See Doc. No. 78, Exhibit E,
plaintiff's deposition).

recent CT Scan available. Id. at ¶ 14.

On June 6, 2000, plaintiff was scheduled to receive chemotherapy treatment from Dr. Cadiz at Hematology and Medical Oncology Associates, P.C.  Plaintiff advised Dr. Cadiz, however, that he did not want anymore chemotherapy, including the treatment which was scheduled for that day.  He expressed a concern to Dr. Cadiz that his treatment plan called for additional chemotherapy cycles beyond what he was initially prescribed by the first oncologist.  Id. at ¶ 15.

On June 7, 2000, Dr. Lasky[8] met with Lattimore to discuss his decision to discontinue his chemotherapy treatments.  Id. at § 16.  They again met on June 8, 2000 and Lattimore still did not want to continue with the chemotherapy treatments. Lattimore indicated that he wanted to wait until he was transferred to a permanent institution to begin radiation treatments.  On that date, Lattimore signed an Against Medical Advice form indicating that the failure to have the treatment could increase his symptoms from Hodgkin's disease.  (Doc. No. 78, Exhibit B, p. 57, copy of release from responsibility for medical treatment).

---

8. Dr. Lasky has served as Wexford Health Sources' Medical Director at SCI-Camp-Hill since September, 1996, when Wexford became the contracted medical provider.  His services include the examination, diagnosis and treatment of inmates at the facility, as well as referral of inmates for consultations with outside physicians whenever medically necessary.  Id. at ¶3.

14

On July 25, 2000, Lattimore was seen by Physician Assistant Michael Sims. At that time, he requested to see Dr. Lasky concerning chemotherapy. (Doc. No. 78, Exhibit A, Lasky Dec., ¶ 18). On July 29, 2000, Dr. Lasky spoke with Lattimore about his treatment options for the Hodgkin's disease. Dr. Lasky approved a consultation for a follow-up visit with the oncologist and also ordered blood work to be performed prior to the next visit with the oncologist. Id. at ¶ 19. On August 1, 2000, plaintiff's blood work was performed and the results were forwarded to Dr. Cadiz for the August 14, 2000 follow-up visit for chemotherapy. Id. at ¶ 20.

On August 14, 2000, Lattimore was evaluated by Dr. Cadiz. At that time, he received day fifteen of his third cycle of chemotherapy and there was some discussion as to whether or not he could proceed directly to radiation therapy or if he should complete the prescribed chemotherapy. Id. at ¶ 21.

On August 24, 2000, Dr. Lasky spoke with Dr. Barnes at Hematology and Medical Oncology Associates, P.C. to determine whether Lattimore should remain on medical hold at SCI-Camp Hill to complete the prescribed chemotherapy or whether it would be appropriate to transfer him to his permanent institution to pursue further treatment for his Hodgkin's disease. Id. at ¶ 22. A consult for a follow-up evaluation by Dr. Barnes at Hematology and Medical Oncology Associates, P.C. was

15

approved on August 29, 2000, .

On September 26, 2000 Dr. Barnes evaluated the plaintiff and requested follow-up CT Scans of plaintiff's chest and upper abdomen.  Id. at ¶ 23.  The CT Scans conducted at Smith Radiology, Inc. on October 3, 2000 noted no significant interval change since the time of the previous CT Scan of the chest on April 4, 2000. The CT Scan of the abdomen was normal.  Id. at ¶ 24.

On October 10, 2000, Dr. Barnes again evaluated Lattimore.  There was no new symptomology referable to his Hodgkin's disease, however, Dr. Barnes requested a biopsy to determine whether to refer plaintiff for radiation therapy or whether to continue with the chemotherapy.  Id. at ¶ 25. The biopsy of the lymph node from plaintiff's neck was performed on October 26, 2000 and there was no evidence of malignancy.  Id. at ¶ 26.

On November 14, 2000, plaintiff Dr. Barnes evaluated plaintiff again.  It was noted that plaintiff now had biopsy-proven remission of the Hodgkin's disease.  At that time, Dr. Barnes indicated that he would like the opinion of a radiation oncologist to see whether or not radiation therapy was appropriate.  Id. at ¶ 27.

On November 15, 2000, Dr. Lasky approved a consultation request to have the plaintiff seen at Oakwood Radiation Center for evaluation of the appropriateness of

16

radiation therapy. Id. at ¶ 28.

On December 13, 2000, Dr. Lasky approved a consultation request for a PET Scan to determine whether there was residual Hodgkin's disease in the chest. If the PET Scan was positive, then Lattimore would be referred for radiation therapy. The PET Scan, however, was cancelled because the plaintiff exceeded the 300-pound weight limit of the Scan table. Id. at ¶ 29.

On February 1, 2001, the plaintiff was transferred to SCI-Graterford. He was examined on March 8, 2001, by Carl Sharer, D.O., and oncologist, who saw no evidence of recurrent disease. Id. at ¶ 30. On March 15, 2001, a Gallium Scan was conducted and was read as normal. Id. at ¶ 31.

In an attempt to counter Dr. Lasky's affidavit and the materials submitted by defendants, the plaintiff has submitted a brief in opposition to the defendants' motion for summary judgment, a statement of material facts, and exhibits. (Doc. No. 82). These documents, however, contain nothing more than a mere restatement of the claims already alleged in the plaintiff's original complaint, as well as legal argument.

Rule 56(c) requires that the party who bears the burden of proof make a sufficient showing to establish the existence of an element essential to that party's case. Rule 56(e) specifies the type of evidentiary materials which must be submitted.

Thus, even had defendants submitted no evidentiary matters, the burden would still be on the plaintiff to sustain his burden.  Celotex v. Catrett, 477 U.S. 317 (1986). What plaintiff has done is submit so called "statement of undisputed material facts", unsupported by any evidentiary materials, which amounts to a mere elaboration of the allegations in his complaint, and this he cannot do.  See Applegate v. Top Associates, Inc., 425 F.2d 92 (2nd Cir. 1970).  (A mere elaboration of conclusory pleadings is insufficient).  As the court in Quiroga v. Hasbro, Inc., 934 F.2d 497 (3d Cir. 1991) stated, a party opposing summary judgment may not rest upon mere allegations, general denials, or vague statements that conduct occurred.  The evidence submitted must show more than some metaphysical doubt as to the material facts.  Id. at 500.

Moreover, the plaintiff has submitted no expert medical opinion to controvert the defendants' expert medical opinion.  When expert opinion is offered in support of a motion for summary judgment, the opposing party must supply opposing expert opinion to create a triable issue of fact.  Gaus v. Mundy, 762 F.2d 338 (3d Cir. 1985). Rather, plaintiff relies on his own unsupported lay-person speculation, which he cannot do. Borig v. Kozakiewicz, 833 F.3d 468, 473 (3d Cir. 1987)(plaintiff failed to meet burden of proof by failing to offer expert testimony that his injury was

18

"serious").

On the other hand, the defendants have submitted an affidavit and materials in support of their motion which have not been controverted by the plaintiff. Thus, the material facts set forth by the defendants may be accepted as true. <u>Shulz v. Celotex</u>, 942 F.2d 204 (3d Cir. 1991); <u>Anchorage Associates v. V.I. Bd. of Tax Review</u>, 922 F.2d 168, 175 (3d Cir. 1990); <u>Gaus v. Mundy</u>, 762 F.2d 338 (3d Cir. 1985).

The undisputed facts illustrate clearly that plaintiff received medical care. While plaintiff may have not been satisfied with the degree of care he received, the record establishes meaningful efforts by the defendants to provide Lattimore with necessary medical care, and an attendant mental state that falls woefully short of deliberate indifference. Moreover, the record reveals that any delay in treatment was clearly a result of plaintiff's own doing.

Lattimore has failed to present evidence from which a reasonable jury could conclude that the defendants possessed the culpable mental state necessary for Eighth Amendment liability to attach. There is insufficient proof in the record for a fair-minded jury to conclude that the defendants were deliberately indifferent to Lattimore's medical needs. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976);

19

<u>Monmouth County Correctional Institution Inmates v. Lanzaro</u>, 834 F.2d at 346;

<u>West v. Keve</u>, 571 F.2d at 161.  Indeed, the scope and quality of medical attention

that the defendants provided Lattimore precludes a finding of deliberate indifference.

Therefore, the motions for summary judgment filed by defendants will be granted.

An appropriate order is attached.

JOHN E. JONES III
United States District Judge

DATED: December 2 , 2002

20

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT M. LATTIMORE, JR.,                    :

                    Plaintiff                :        No. 4:CV-01-0124

                                             :

          vs.                                :

                                             :        (Judge Jones)

MARTIN LASKY, M.D., et al.,                  :
                    Defendants               :

## ORDER

NOW, THEREFORE, THIS 2ʷ DAY OF DECEMBER, 2002, for the

reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED**

**THAT:**

1.    Defendants' motions for summary judgment, (Doc. No. 70 & 75), are

      granted.  Judgment is hereby entered in favor of the defendants and

      against plaintiff.

2.    The Clerk of Court shall close this case.

3.    Any appeal taken from this order will be deemed frivolous, without

      probable cause, and not taken in good faith.

JOHN E. JONES III
United States District Judge

**EXHIBIT**

5

1        IN THE UNITED STATES DISTRICT COURT
2         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3    PHAN HUE,                    :

4             Plaintiff,          :
                                  :    CIVIL ACTION -- LAW
5        vs.                      :
                                  :    JURY TRIAL DEMANDED
6    JAMES UPDIKE, JOSEPH         :
     MATALONI, EDWARD O'BRIEN,    :
7    DALE HAZLAK,                 :
                                  :
8             Defendants.         :    NO.:  1:-CV-01-1064
     ::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

9

10

11

12

13              DEPOSITION TRANSCRIPT

14

15            Testimony taken at the Deposition of

16    PHAN HUE, on Wednesday, July 31, 2002, commencing at

17    11:48 a.m., at the State Correctional Institute at

18    Retreat, Hunlock Creek, Pennsylvania.

19

20

21

22    _____

23
                    SUZAN LATONA REPORTING
24                108 Main Street - Inkerman
                Pittston, Pennsylvania  18640
25



13

1      Q.    What was that DY?

2            THE INTERPRETER:  DY0577.

3      Q.    When did you first become incarcerated at

4    SCI Retreat?

5            THE INTERPRETER:  Around July something, I

6    don't know exact dates, but July of 1999.

7      Q.    And how long a term are you serving?

8            THE INTERPRETER:  That I don't know.

9      Q.    Okay.  Prior to coming to SCI Retreat, had

10   you ever been in the hospital?

11           THE INTERPRETER:  No.

12     Q.    Had you ever suffered an injury to your

13   shoulders prior to prison?

14           THE INTERPRETER:  No.

15     Q.    Did you ever suffer any injury to your teeth

16   prior to coming to prison?

17           THE INTERPRETER:  No, I used to -- just

18   before -- before coming to CSI (sic), I had just like

19   my tooth just kind of lose and I go to dentist and

20   pull it but. . .

21     Q.    So how many teeth had you had extracted

22   before you came to prison?

23           THE INTERPRETER:  I cannot recall.

24     Q.    Did you have false teeth before you came to

25   prison?

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHAN HUE,                             :
                                      :
    Plaintiff,                :        Civil No. 01-CV-1064
                                      :
    v.                        :        (Judge Kane)
                                      :
JAMES UPDIKE, et al.,                 :        (Magistrate Judge Smyser)
                                      :
    Defendants.               :

## UNSWORN DECLARATION OF SHEILA RIDILLA

I, Sheila Ridilla, declare under penalty of perjury that the following facts are true and correct based upon my personal knowledge:

1. I am the Litigation Coordinator at SCI-Retreat. I have held this position since July 8, 2002.

2. Prior to coming to SCI-Retreat I was at the Department of Corrections' Central Office as a Program Analyst in the Standards, Practices & Security Bureau.

3. I have been with the Pa. Department of Corrections since 1981.

4. Prior to 2003, when inmates arrived at their assigned institution following their initial classification from the Diagnostic & Classification Center, they were issued and signed for an inmate handbook that contained all administrative directives, which are the policies directly affecting inmates.

5. Whenever a revision or policy change occurred with one of these directives, a bulletin or revised policy gets issued to the facilities.

6. The individual facilities ensure the revisions are distributed to the inmate population (individually) as well as posted on each housing unit and in the library.

7. DC-ADM 804, Inmate Grievance Procedure Policy was originally issued on July 7, 1994. Bulletins (revisions to sections of a policy) were issued as follows: 804-1 on April 2, 1996; 804-2 on October 1, 1997; 804-3 on October 21, 1997; 804-4 on April 29, 1998; and 804-5 on October 30, 2000.

8. The current DC-ADM 804 was issued on December 1, 2000.

9. Following his initial classification from the Diagnostic & Classification Center, Phan Hue was assigned to SCI-Retreat on July 27, 1999, where he remained until his transfer to SCI-Mahanoy on October 24, 2002.

_Sheila Ridilla_
Sheila Ridilla
Litigation Coordinator
SCI-Retreat

Date: 4-4-03

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHAN HUE,                          :
                                   :
    Plaintiff,         :        Civil No. 01-CV-1064
                                   :
    v.                 :        (Judge Kane)
                                   :
JAMES UPDIKE, et al.,              :        (Magistrate Judge Smyser)
                                   :
    Defendants.        :

## CERTIFICATE OF SERVICE

I hereby certify that I am this day depositing in the U.S. mail a true and correct copy of Defendants' Exhibits in Support of Corrections Defendants' Summary Judgment Motion in the above-referenced matter.

<u>Service by first-class mail addressed as follows:</u>

Phan Hue, DY 0577                  Alan Gold, Esquire
SCI-Mahanoy                        Monaghan & Gold, P.C.
301 Morea Road                     7837 Old York Road
Frackville PA 18621                Elkins Park, PA  19027


                                  <u>s/ Marilyn Wright</u>
                                  Marilyn Wright
                                  Clerk Typist 2

Department of Corrections
Office of Chief Counsel
55 Utley Drive
Camp Hill, PA  17011
(717) 731-0444
Dated:  April 9, 2003