# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHAN HUE,                                     :
                                              :
    Plaintiff,                            :          Civil No. 01-CV-1064
                                              :
                                              :          (Judge Kane)
    v.                                    :
                                              :          (Magistrate Judge Smyser)
JAMES UPDIKE, et al.,                         :
                                              :          Filed Via Electronic Case Filing
    Defendants.                           :

## EXHIBITS IN SUPPORT OF CORRECTIONS DEFENDANTS' SUMMARY JUDGMENT MOTION

**EXHIBIT A:**  Corrections Defendants Statement of Material Facts under Local Rule 56.1.

**EXHIBIT B:**  Declaration of Joseph Mataloni

**EXHIBIT C:**  Declaration of Joseph Giza

**EXHIBIT D:**  Declaration of Edward O'Brien

**EXHIBIT E:**  Declaration of Dale T. Hazlak
                 Attachment 1: Misconduct Report

**EXHIBIT F:**   *Wilson v. Wignen*, Civil Action No. 96-0620, Civil Action No. 96-1241, U.S.D.C.-E.D., 1998 U.S. Dist. LEXIS 5792, April 24, 1998, Decided, April 24, 1998, Filed, Entered.

**EXHIBIT G:**   Pages from Deposition of Phan Hue taken on July 31, 2002.

Respectfully submitted,

Office of General Counsel

BY,s/ Marsha Mills Davis
  Marsha Mills Davis
  Assistant Counsel
  Attorney I.D. No. 28018
  Pennsylvania Department of Corrections
  Office of Chief Counsel
  55 Utley Drive
  Camp Hill PA  17011
  (717) 731-0444

Date:  April 11, 2003

EXHIBIT

A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHAN HUE,                           :
                                    :
        Plaintiff,                  :       Civil No. 01-CV-1064
                                    :
        v.                          :       (Judge Yvette Kane)
                                    :
JAMES UPDIKE, et al.,               :       (Magistrate Judge, J. Andrew Smyser)
                                    :
        Defendants.                 :

## CORRECTIONS DEFENDANTS
## STATEMENT OF MATERIAL FACTS

And Now Comes Marsha M. Davis, Assistant Counsel for Corrections Defendants who avers the following in support of their Motion for Summary Judgment on the Facts.

1.      At all times relevant hereto, Phan Hue (last name is actually Phan) ("Plaintiff") was housed at the State Correctional Institution at Retreat ("SCI-Retreat").

2.    At all times relevant hereto, Defendant, Joseph Mataloni, was employed as the Health Care Administrator at SCI-Retreat.  Mataloni Declaration ¶ 1.

3.    At all times relevant hereto, Defendant, Dale Hazlak, was employed as a Unit Manager at SCI-Retreat. Hazlak Declaration ¶ 2, 3.

4.    At all times relevant hereto, Defendant, Edward O'Brien, was employed as the Food Services Manager at SCI-Retreat. O'Brien Declaration ¶ 1.

5.    At all times relevant hereto, Joseph Giza was employed as a Corrections Employment/Vocational Coordinator at SCI-Retreat. Giza Declaration ¶ 1

6.    As Corrections Health Care Administrator at SCI-Retreat, Mataloni duties included the following:  planning, organizing and managing the health care services program at SCI-Retreat, coordinating the professional medical staff in cooperation with a contracted medical vendor and compliance monitoring and supervision of contracted medical services.  Mataloni Declaration ¶ 3.

7.    Plaintiff fell in the kitchen area on February 28, 2000.  O'Brien Declaration ¶ 5.  He was taken to an outside hospital, where he saw a doctor, who prescribed "Tylenol or Ibuprofen, every 6 hours for 5 days for pain and referred the Plaintiff, if no improvement in 5-7 days or if his condition worsens, or if any new symptoms arise, …to follow up with orthopedics." Mataloni Declaration ¶ 14.  Hue Deposition page 28-30.

8.  An X-ray of Plaintiff's shoulder was taken prior to his going to the hospital on February 28, 2000. The radiologist read the X-ray as a "normal right shoulder." Mataloni Declaration ¶ 13.

9.  Plaintiff's shoulder was X-rayed at the hospital as well. The radiologist read the X-ray as "normal right shoulder." Mataloni Declaration ¶ 15.

10. The SCI-Retreat medical staff immediately provided Plaintiff with a shoulder harness ("sling") and medication February 28, 2000. Mataloni Declaration ¶ 11, 19. Hue Deposition pages 30, 85.

11. Hue remained in the infirmary over night and until 10:10 a.m. the next day. Hue Deposition page 32. Mataloni Declaration ¶ 16, 19.

12. On February 23, 2000, (five days before the incident), Plaintiff was seen by the dentist and scheduled for a full upper extraction on February 29, 2000, of all remaining teeth due to extensive periodontal disease. He was already without any lower teeth, and the remaining ten teeth on top were unable to be salvaged. Mataloni Declaration ¶ 17.

13. On February 29, 2000, at 08:45 a.m., the dentist at SCI-Retreat removed Plaintiff's upper ten teeth. Mataloni Declaration ¶18. Hue Deposition page 32.

14. On February 29, 2000, at 10:10 a.m., Plaintiff was examined by Dr. Marana and released to his cell, with a sling for his arm and Penicillin to prevent

3

infection following the extraction of his teeth. At that the time, the medical staff did not issue Plaintiff any lay-ins or medical restrictions. Mataloni Declaration ¶ 19.

15. Plaintiff was allowed to use the sling until March 23, 2000, when it was taken by James Updike, Physician's Assistant ("PT"). Mataloni Declaration ¶ 27. Hue Deposition page 57.

16. Medication: Tylenol, ibuprofen, darvocet, Motrin or naprosyn were provided to Plaintiff by the SCI-Retreat medical department up through February 15, 2001. Mataloni Declaration ¶¶ 19, 25, 32, 34, 37-45. Hue Deposition page 86. On February 15, 2001, Dr. Diaz ordered Plaintiff to take Indocin for ten days but Plaintiff failed to appear for the first four days of the ten days of treatment. Mataloni Declaration ¶ 46.

17. On March 3, 2000, Dr. Marana referred Plaintiff to Dr. Stempler, an Orthopedic Surgeon. Mataloni Declaration ¶ 24.

18. Dr. Stempler is a contract Orthopedic Surgeon who, when needed, comes to SCI-Retreat at the direction of the Medical Director. Mataloni Declaration ¶ 25.

19. Dr. Stempler saw Plaintiff on March 8, 2000. Dr. Stempler diagnosed Plaintiff with a right AC sprain, and extended Plaintiff's use of the sling for two weeks, as well as anti-inflammatory medications, and ordered no

4

strenuous use of Plaintiff's right upper extremity for two weeks. Mataloni Declaration ¶ 26.

20.   Dr. Stempler indicated no need for a follow up visit. Mataloni Declaration ¶ 26.

21.   Plaintiff signed up for sick call and saw the medical staff at SCI-Retreat for his shoulder a minimum of twenty-one times, between February 28, 2000, and February 14, 2001. Mataloni Declaration ¶¶ 10-42.

22.   Medical lay-ins is given to inmates by the medical department in order to limit their movement throughout the institution. If an inmate's medical condition would preclude him from any/all of the daily activities normally afforded to other inmates in the institution, the medical department would issue a medical lay-in in order to prevent/excuse him from participation in those activities. Mataloni Declaration ¶ 21.

23.   Plaintiff returned to work in March 2000. Hue Deposition page 90.

24.   Plaintiff was given light duty in the kitchen during the next two months. Hue Deposition page 101. O'Brien Declaration ¶ 7.

25.   Plaintiff was seen at sick call on March 23, 2000. He complained of shoulder pain when he moves his shoulder. PT Updike discontinued the use of the sling (Dr. Stempler recommended it for two weeks on 3/8) because Plaintiff had limited range of motion in the shoulder. The record indicates

PT Updike instructed Plaintiff on exercises that he should be doing to increase his range of motion, but Inmate Plaintiff left abruptly. PT Updike referred Plaintiff to the physical therapist at SCI-Retreat for consultation. Mataloni Declaration ¶ 28.

26. The decisions to withhold the sling, to change or stop medication, or to make a referral to a bone specialist are made by trained medical personnel, the Medical Director at SCI-Retreat or his staff. Mataloni does not treat or prescribe treatment for inmates or staff. Mataloni Declaration ¶¶ 4, 29.

27. At no time was Plaintiff denied a sling or referral for any improper or malicious reason. Rather, he was denied a sling and referral to another bone specialist because medical staff at SCI-Retreat determined that it was not medically necessary. Mataloni Declaration ¶ 30.

28. Plaintiff was seen on April 12, 2000, by Mathew DiPaolo, Physical Therapist (PT), who warned against any further splinting with a sling. Passive range of motion exercises was given to Plaintiff. PT DiPaolo saw Plaintiff again on April 26, 2000. The PT noticed an increase in Plaintiff's range of motion and documented crepitates (a cracking sound) at the ends of the range of motion. Mataloni Declaration ¶¶ 30, 32.

29. Plaintiff was seen at sick call on April 27, 2000. PT Updike offered Plaintiff medication for pain and ordered that it be given to Plaintiff at the medication

line rather than to Plaintiff directly, to better track Plaintiff's need/compliance. Plaintiff did not want to come to the medication line, so PT Updike informed Plaintiff that the same medication was available in the commissary. Mataloni Declaration ¶ 33.

30. Plaintiff refused to go to work on April 28, 2000. Hazlak Declaration ¶ 15. "I went back to work... and I just said forget it. I don't want to work. Whatever happens happens." Hue Deposition page 90.

31. Plaintiff received a misconduct citation on April 28, 2000 from Barry Horvath (Food Services Instructor) for failing to report to work. Plaintiff told Mr. Horvath that he was on a medical lay-in, but when Mr. Horvath checked with the medical department he learned there was no reason why Plaintiff should not work. Hazlak Deposition ¶ 15 and Attachment 1. Hue Deposition pages 90, 100.

32. Unit Manager, Hazlak, on May 1, 2000, resolved the failure to report to work allegation internally. Hazlak ordered Plaintiff to clean the showers for three days; May 3-5, 2000. Hazlak ordered Plaintiff to do this after contacting the medical department to determine if Plaintiff had any medical restrictions. Hazlak Declaration ¶¶ 17, 20, 23.

33. Failure to work is a violation of prison policy. Work assignments and the expectation of inmates regarding their work assignments are governed by

DC-ADM 816. The policy states: "that failure to report to or refusal to work is regarded as a misconduct. Absence from your job without prior knowledge and permission from a staff member is not allowed." DC-ADM 816, "Work Assignments." Hazlak Declaration ¶ 16.

34. Plaintiff returned to work in the kitchen. Hue Deposition page 90. Giza Declaration ¶ 15. O'Brien Declaration ¶ 6. On May 8, 2000, O'Brien received a Request to Staff form from Plaintiff, indicating he was in pain and could not work. Plaintiff requested light duty. Hue Deposition pages 99-102. O'Brien Declaration ¶ 11.

35. Upon receipt of the Request to Staff form, O'Brien called Hazlak to see if he was aware of any medical lay-ins or restrictions that would prevent Plaintiff from working. Hazlak Declaration ¶ 24. O'Brien Declaration ¶ 13.

36. There was no reason indicated in the log or by medical that Plaintiff could not work May 8, 2000. Hazlak Declaration ¶ 23, 24.

37. O'Brien indicated to Plaintiff that because there was no indication that he could not work, he was still assigned to work in the kitchen. O'Brien Declaration ¶ 14.

38. Plaintiff saw someone in the medical department on May 8, 2000, and again on May 10, 2000. The medical department staff did not order a lay-in or work restrictions for Plaintiff. Mataloni Declaration ¶ 36.

39.  Plaintiff was seen at sick call on May 12, 2000.  The staff prescribed Plaintiff medication for pain and another X-ray. Mataloni Declaration ¶ 34. The X-ray report was interrupted as "Unremarkable soft tissue and skeletal structures." Mataloni Declaration ¶ 35.

40.  Plaintiff did not work May 15, 2000.  Giza Declaration ¶ 16.

41.  PT Kuloszewski saw plaintiff in sick call on May 15, 2000.  Plaintiff's medication for pain was changed; he was given a work restriction (which was clarified on May 18) not to lift anything greater than ten pounds for the next two months.  Plaintiff was laid- in for May 15, 2000, by the medical staff.  Mataloni Declaration ¶ 37.

42.  As a result of the medical restrictions placed on Plaintiff on May 15, 2000, O'Brien in an exercise of caution, gave Plaintiff a six-week lay-in (May 25-July 28). This was documented on May 25, 2000.  O'Brien Declaration ¶¶ 15-17.

43.  During his lay-in, Plaintiff was seen by the medical staff for follow-up care which consisted primarily of medication adjustments.  Mataloni Declaration ¶¶ 38-40.

44.  Plaintiff reported to the Medical Department on January 17, 2001 at 5:50 p.m. because of an injury to his thumb.  Mataloni Declaration ¶ 41.

45. Dr. Diaz saw Plaintiff on January 18, 2001. Mataloni Declaration ¶ 42. Following his evaluation, Dr. Diaz ordered another X-ray report of Plaintiff's shoulder, as well as the thumb, additional Motrin and Tylenol for ten days, referrals to both the PT and the orthopedist, lab work, and a lay-in for two days. Mataloni Declaration ¶ 42.

46. The shoulder X-ray report was interpreted as "No fracture or dislocation." Mataloni Declaration ¶ 42.

47. On February 14, 2001, PT Mathew DiPaolo found no significant improvement in Plaintiff's condition and recommended that Plaintiff receive an MRI for further diagnostic evaluation. Mataloni Declaration ¶ 43.

48. Dr. Stempler, Orthopedic Surgeon, also saw Plaintiff on February 14, 2001. At that time, Dr. Stempler diagnosed Plaintiff with bursitis of the right shoulder. Mataloni Declaration ¶ 44.

49. On February 14, 2001, Dr. Diaz ordered Plaintiff to receive an MRI. The MRI was performed on March 7, 2001. Mataloni Declaration ¶ 45. MRI's are done off-site, by Wilkes-Barre Imaging Center. The reading of the radiologist was that Plaintiff suffered from " Early acromioclavicular joint osteoarthrosis. No evidence of rotator cuff tear." Mataloni Declaration ¶ 45.

50. On February 15, 2001, Dr. Diaz ordered Plaintiff to take Indocin for ten days to try and ease the bursitis. Plaintiff did not show-up for his dose of the Indocin for the first four and one-half days of treatment. Mataloni Declaration ¶ 46.

51. Plaintiff had access to the Medical Department via the Inmate Request Slip process. If Plaintiff addressed an inmate request to the medical department, Mataloni would answer that request in a timely fashion. If Plaintiff requested a meeting with Mataloni concerning a medical issue, it was scheduled via the Inmate Call-Out System. If inmate Plaintiff had addressed any inmate request slips to medical, he would have the original(s). The Health Care Administrator does not maintain copies of requests. Mataloni Declaration ¶ 49.

52. At all times, medical treatment was available to Plaintiff and in fact, he visited the medical department, regularly. Mataloni Declaration ¶ 50.

53. At all times relevant, hereto, O'Brien was unaware of any alleged threat by Plaintiff to sue because of conditions of the workplace. O'Brien Declaration ¶ 26.

54. At all times relevant hereto, Hazlak was unaware of any alleged threat by Plaintiff to sue because of conditions of the workplace or that Plaintiff may

be pursuing any other legal rights, other than his appeal on his conviction. Hazlak Declaration ¶ 32.

55. At all times relevant, hereto, O'Brien did not force Plaintiff to work or to work beyond his work restrictions, if any. Just the opposite, when supported by the medical department staff, O'Brien gave Plaintiff a lay-in from work, with pay. O'Brien Declaration ¶¶ 7, 15, 20, 24.

56. The Employer, in this case O'Brien, can give a lay-in for inmates hurt on the job, for inmates to attend programs, for inmates to obtain medial appointments or for inmates to receive discipline. O'Brien Declaration ¶ 16.

57. At no time did Mataloni treat Plaintiff, provide him with medical equipment, or take away or interfere with the treatment being provided by the medical staff. Mataloni Declaration ¶ 4, 52. Hue Deposition pages 57, 99.

58. At no time was Plaintiff prevented from signing up for sick call or prevented from attending medical appointments. Plaintiff was never denied a medical appointment. Hue Deposition page 88.

59. Plaintiff continued to perform duties in the kitchen from March 2000 until February 4, 2001, when he was re-assigned to the laundry area. This assignment came as a result of a new opening and Plaintiff was next on the list. Giza Declaration ¶ 6, 13.

60.   Giza's job duties include; recommending work assignments and vocational/technical training for the development and implementing individualized treatment plans for inmates.   Giza's work involves coordinating the utilization of inmate employees to fulfill the needs of institutional activities in a variety of occupational areas.  The work involves identifying and resolving a variety of problems associated with screening and placing inmates into appropriate jobs due to the skills required in the job assignments, the limitations imposed by the inmates physical and psychological conditions, and the resulting impact of the inmates prescriptive program plans on job placement.   The work also includes accountability for the inmate payroll and compensation system ensuring that inmate job assignments and payment or work performed by the inmate are accomplished in accordance with agency policies and guidelines.   Giza Declaration ¶ 2.

61.   Giza was never contacted by Plaintiff regarding Plaintiff's ability to do his job or to request a job change.  Giza Declaration ¶ 19.

62.   Many jobs exist in the kitchen at SCI-Retreat.  Only he and his supervisor know the specific duties assigned to Plaintiff.  Jobs in the kitchen exist that require no lifting.  Giza Declaration ¶ 8.  O'Brien Declaration ¶ 7.

63.  Since the Plaintiff began working in the laundry February 5, 2001, he has not missed work.  Giza Declaration ¶ 15.  Plaintiff has even worked additional hours.  Hue Deposition page 112.

64.  Plaintiff's job in the laundry did not result from a fear that he would sue for conditions in the workplace or to prevent him from seeking medical care. Giza Declaration ¶ 13, 14.

65.  Plaintiff returned to work in the kitchen on July 29, 2000.  O'Brien had no further contact with Plaintiff about his February 2000 injuries after May 2000.  O'Brien Declaration ¶ 17.

66.  Hazlak had no conversations with Plaintiff or written requests from Plaintiff regarding his medical condition, subsequent to the May 1, 2000 misconduct resolution.  Hazlak Declaration ¶ 33.

67.  Hazlak, Unit Manager, can authorize inmates not to work for purposes of scheduled meetings, staffing, or to address an inmate request.  Hazlak Declaration ¶ 26.

68.  At all times relevant, hereto, Defendants could not objectively discern any conditions/actions of Plaintiff that support the alleged subjective complaints made by Plaintiff.  Hazlak Declaration ¶ 34. O'Brien Declaration ¶ 23. Mataloni Declaration ¶ 58.

14

69. At no time was Plaintiff denied a sling or medication or consultation with another bone specialist for an improper or malicious reason. Rather, he was denied consultation with another bone specialist and the sling because the Medical Staff at SCI-Retreat determined that it was not medically necessary. Mataloni Declaration ¶ 30.

70. Plaintiff was given work assignments, based in part, on medical clearances issued by the medical department. Giza Declaration ¶ 4, 8.

71. At no time did O'Brien deny Plaintiff's injury or fail to recognize his injury in the kitchen. Rather, he provided Plaintiff with light duty up until his own order indicating Plaintiff need not to appear for work May 25-July 28, 2000. O'Brien Declaration ¶¶ 7, 15. Hue Deposition page 101.

72. Hazlak never acted in retaliation for any lawsuit, which Plaintiff may have filed. Hazlak Declaration ¶ 29.

73. During April 28-May 5, 2000 as far as Hazlak knew there were no medical restrictions or lay-ins ordered for the Plaintiff requiring that he not work. The normal procedure that Hazlak followed is to check with the medical department to see if their records reflected a medical lay-in or work restrictions on the inmate in question. If there had been a medical restriction or lay-in, Plaintiff would not have been guilty of failing to report to work

and would not have been given extra duties.    Hazlak Declaration ¶¶ 15, 22 and 23.

74.  There were no obstacles to Plaintiff signing up for sick call to have an evaluation of his ability to work (in order to provide documentation to Hazlak that he could not work).  Hazlak Declaration ¶ 7.  Hue Deposition page 88.

75.  Since his MRI on March 7, 2001, Plaintiff has not come to the medical department to complain about his shoulder or to request to see a bone specialist.  Mataloni Declaration ¶¶ 47.

76.  Plaintiff seeks only to have an independent medical examination and his shoulder treated in accordance with the findings thereof.  Hue Deposition page 57, 126, 128.

Respectfully Submitted,

Office of General counsel

BY: s/ Marsha Mills Davis
        Marsha Mills Davis
        Assistant Counsel
        Attorney I.D. No. 28018
        Pennsylvania Department of Corrections
        Office of Chief Counsel
        55 Utley Drive
        Camp Hill, PA  17011
        (717) 731-0444

Dated:  April 11, 2003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHAN HUE,                               :
                                        :
    Plaintiff,                       :    Civil No. 01-CV-1064
                                        :
    v.                               :    (Judge Yvette Kane)
                                        :
JAMES UPDIKE, et al.,                   :    (Magistrate Judge, J. Andrew Smyser)
                                        :

### Declaration of Joseph Mataloni

    I, Joseph Mataloni, declare under penalty of perjury that the following facts

are true and correct based upon my personal knowledge:

1.    I am the Correction's Health Care Administrator (CHCA) at SCI-Retreat and

    have been employed there as such since November 1993.

2.    Plaintiff's name is Phan Hue according to his commitment.  The last name is

    Phan.

3.    My duties include planning, organizing and managing the health care

    services program at SCI-Retreat, the coordination of a professional medical

staff in cooperation with a contracted medical vendor and compliance monitoring and supervision of contracted medical services.

4.  I maintain the medical records of inmates incarcerated at SCI-Retreat. I do not treat or prescribe treatment for inmates or staff.

5.  On July 27, 1999, Plaintiff was first seen in the medical department/dental at SCI-Retreat for a reception screening.

6.  On September 25, 1999, Plaintiff reported to the medical department at 2025. He stated that he fell while playing soccer and went rolling. He was examined by RN Roth and admitted to the infirmary for 23-hour observation, following a call to Dr. Marana. He reported an injury to his left hand and right shoulder.

7.  Examination of the right shoulder by RN Roth revealed that it "cracked on movement". She also noted a slight deformity in the right shoulder compared to the left.

8.  Dr. Marana examined Plaintiff the next day on Sept 26, 1999 at 1330. Dr. Marana's examination was essentially negative, but he did note, "crepitating" (cracking) in the right shoulder upon movement.

9.  Dr. Marana ordered an X-ray of the right shoulder, which was read, with the Impression of "Normal right shoulder".

2

10.   Plaintiff had no interaction with the medical department until February 28, 2000 when he came to the medical unit after allegedly falling in the kitchen.

11.   At 1230 on February 28, 2000, RN Blasi reported to the kitchen area in response to a call from the food service supervisor. She found Plaintiff on the floor complaining that he fell on the wet floor, onto his right shoulder. RN Blasi secured his arm with a sling and then secured it to his torso with an ace wrap. He was then transported to the medical department. No report was made of mouth or tooth pain and or trauma.

12.   Dr. Marana examined Plaintiff at 1320. Dr. Marana ordered a stat x-ray and ordered Plaintiff to the emergency room in order to rule-out a possible dislocated shoulder.

13.   Plaintiff was x-rayed before he left for the hospital, and the radiologist's read the Xray as "Normal right shoulder".

14.   Plaintiff was seen by a doctor in the emergency room of Wilkes-Barre General Hospital, and discharged with the following orders:

-   Standard SPRAIN\CONTUSION Protocol

-   Apply Ice pack for 20 minutes of every hour

-   Pain controlled by Tylenol or Ibuprofen, every 6 hours for 5 days for pain

- Wear sling 5 to 7 days, if his condition worsens, or if new symptoms arise, follow-up with orthopedics.

15. Plaintiff was also x-rayed at the hospital, the radiologist's interpretation was that of "Normal right shoulder".

16. Plaintiff was returned to the institution and placed in infirmary observation over night until seen by Dr. Marana the following day.

17. On February 23, 2000, (five days before the incident), Plaintiff was seen by the dentist and scheduled for a full upper extraction on February 29, 2000 of all remaining teeth due to extensive periodontal disease. He was already without any lower teeth, and the remaining ten teeth on top were unable to be salvaged.

18. On February 29, 2000, at 8:45 a.m. Plaintiff's upper ten teeth were removed by the Oral Surgeon at SCI-Retreat.

19. On February 29, 2000, at 1010, Plaintiff was examined by Dr. Marana and released to the cell, with a sling for his arm and Penicillin for his mouth to prevent infection following the extraction. At the time, no lay-ins or medical restrictions were issued.

20. Routinely, lay-ins and work restrictions are only issued at the request of the inmate, if the Medical Doctor/Physician's Assistant Certified (MD/PAC) considers those concerns to be valid. The MD/PAC does not know what the

physical demands are for every inmate's job assignment, so unless they ask, it probably will not be addressed.

21. Medical lay-ins are given to inmates by the medical department in order to limit their movement throughout the institution. If an inmate's medical condition would preclude him from any/all of the daily activities normally afforded to other inmates in the institution, the medical department would issue a medical lay-in in order to prevent/excuse him from participation in those activities.

22. On May 15, 2000 Plaintiff asked for work restrictions, and they were given to him.

23. Prior to May 15, 2000, if Plaintiff had complained that he could not work, or if the employer or other staff called to inquire, they would have been told there were no medical work restrictions.

24. Plaintiff was seen on March 3, 2000 in the medical department. The Plaintiff reported limited improvement so Dr. Marana ordered a consult with the orthopedic surgeon.

25. Plaintiff was seen by Dr. Stempler, an orthopedic surgeon providing services to the institution as part of the Pennsylvania Department of Corrections contract for Health Care services with Corrections Physician's Services

(CPS).  Dr. Stempler comes to the institution at the command of the Medical Director.

26.    On March 8, 2000, at SCI-Retreat, Dr. Stempler diagnosed Plaintiff with a right AC sprain.  He recommended a sling for 2 weeks, non-steroidal anti-inflammatory medications, and no strenuous use of right upper extremity.  Dr. Stempler indicated no further need for follow-up care/visits.    Dr. Marana, therefore, ordered Motrin 600 mg., four times a day, for 14 days and extended the use of the sling for 14 days.

27.    Plaintiff presents himself at sick call on March 13, 2000 and PAC Updike notices limited movement of the right shoulder.  PAC Updike decides to continue current treatment, nothing added, nothing discontinued.

28.    Plaintiff again is presented for sick call on March 23, 2000 with shoulder pain when he moves his shoulder.  PAC Updike discontinued the use of the sling    (Dr. Stempler recommended it for two weeks on March 8) because Plaintiff had limited range of motion in the shoulder.  The record indicates PAC Updike instructed Plaintiff on exercises that he should be doing to increase his range of motion, but Inmate Plaintiff left abruptly.  PAC Updike referred him to the physical therapist for consultation.

29. The decision to withhold the sling, to change or stop medication and to make referrals to a bone specialist are decisions made by trained medical personnel; the Medical Director at SCI-Retreat or his staff.

30. At no time was Plaintiff denied a sling or referral for any improper or malicious reason. Rather, he was denied a sling and referral to another bone specialist because medical staff at SCI-Retreat determined that it was not medically necessary.

31. Plaintiff was seen on April 12, 2000 by Mathew DiPaolo, Physical Therapist (PT), who warned against any further splinting with a sling. Passive range of motion exercises was given to the Plaintiff.

32. Plaintiff was seen again by the PT on April 26, 2000. The PT noticed an increase in his range of motion and also documented a crepitatus (a cracking sound) at the ends of the range.

33. Plaintiff was seen at sick call on April 27, 2000. Medication for pain was offered (Tylenol, 2 tabs, four times a day), and it was ordered to be distributed on the medication line rather than directly to Plaintiff in order to better track need/compliance. Plaintiff did not want to come to the medication line, so PAC Updike informed him that the same medication was available in the commissary. The medication was still ordered and made available. Medication compliance was approximately 85% to 90%.

34. Plaintiff was seen at sick call on May 12, 2000. Medication for pain was prescribed and another X-ray was ordered.

35. The X-ray report was interrupted as "Unremarkable soft tissue and skeletal structures."

36. Plaintiff was seen on May 8, 2000 for his annual screening for tuberculosis and on May 10, 2000 in physical therapy. No medical lay-in or work restrictions are noted in the record.

37. Plaintiff was seen in sick call on May 15, 2000 by PAC Kuloszewski. His medication for pain was changed and he was given a work restriction (which was clarified on May 18) to not lift anything greater than 10 pounds for the next two months. He was also ordered laid- in for the day.

38. Plaintiff was seen in sick call on May 24, 2000 for renewal of pain medication. During this visit PAC Updike stresses the need to continue range of motion exercises.

39. Plaintiff was seen in sick call on May 26, 2000. He stated that the medication given to him by PAC Kuloszewski seemed to work better. PAC Updike adjusted the medication as requested by Phan.

40. PAC Kuloszewski saw Plaintiff in sick call on June 16, 2000 for medication renewal. Medication was renewed.

41. Plaintiff reports to the medical department on January 17, 2001 at 1750 due to an injury to his thumb. He was sent to the department for assessment of this complaint made on the block concerning his thumb. He was assessed by RN Hall, given one dose of Motrin, and referred to MD sick call in the AM.

42. Dr. Diaz saw Plaintiff on January 18, 2001. Following his evaluation, Dr. Diaz order another X-ray report of the shoulder, as well as the thumb, ordered Motrin and Tylenol for 10 days, referrals to both PT and the orthopedist, lab work, and a lay-in for 2 days. The X-ray report of the shoulder was interrupted as "No fracture or dislocation."

43. On February 14, 2001 Mathew DiPaolo, PT, found no significant improvement and recommended an MRI for further diagnostic evaluation.

44. Dr. Stempler, an Orthopedic Surgeon, also saw Plaintiff on February 14, 2001. At that time, he diagnosed Plaintiff with bursitis of the right shoulder.

45. On February 14, 2001 Dr. Diaz ordered an MRI of the shoulder. The MRI was done on March 7, 2001. MRI's are done off-site, by Wilkes-Barre Imaging Center. The MRI was read by the radiologist " Early acromioclavicular joint osteoarthrosis. No evidence of rotator cuff tear."

46. On February 15, 2001, Dr. Diaz ordered Indocin for 10 days to try and ease the bursitis. Plaintiff did not show-up for not even one dose for the first four and one-half days of treatment.

47.  Following the order for the MRI on February 14, 2001, Plaintiff does not come to the medical department with complaints of shoulder pain or to request a bone specialist until February 7, 2002.

48.  On February 7, 2002, PAC Yarczower encouraged Plaintiff to continue exercises prescribed to him earlier. No further treatment was rendered.

49.  Plaintiff has access to the Medical Department via the Inmate Request Slip process. If Plaintiff addressed an inmate request to me, I will answer that request in a timely fashion. If he or any other inmate requests a meeting with me concerning a medical issue, I will schedule them via the Inmate Call-Out System. If Plaintiff had addressed any inmate request slips to me, he would have the original. I do not retain a copy of answered request, due to the numbers addressed on a daily basis.

50.  At all times, medical treatment was available to Plaintiff and, in fact, he visited the medical department, regularly.

51.  If an inmate either does not get an answer to a request slip or doesn't agree with the answer that he received, he can use the Inmate Grievance process. I am the designated Grievance Officer for all medical grievances. From February 28, 2000 to the present, I have received only 2 grievances from Plaintiff, these were numbers 0112 and 0185. Both of these grievances were reviewed with the appropriate staff, and answered in a timely manner.

Neither grievance complained about O'Brien and his working conditions or Hazlak and any access to care issues. The grievances did not regard being forced to work nor did they request money.

52.    Grievance #0112, filed on April 12, 2000, deals with Plaintiff's discontent with the medical services being provided to him. In my answer to him, I indicated that medical decisions are made by the practitioners. If he is having problems with his medications, he should sign up for sick call. At no time did I seek to deny care, instead I encouraged him to follow the appropriate channels for receiving care.

53.    Grievance # 0185, filed on June 8, 2000, deals with the timeliness of the manufacturing of Plaintiff's dentures. My research into this matter indicated that Plaintiff's appointment record was littered with no-shows for scheduled appointments. My response to him was to start keeping his scheduled appointments.

54.    An inmate has the right to appeal my responses to the Superintendent if he is not satisfied with my responses. From there he may appeal to the Chief Hearing Examiner, if unsatisfied with the Superintendent's answer.

55.    At all times, I was unaware that Plaintiff may file suit over the conditions of the work place.

11

56. At all times, relevant hereto, I was unaware of any serious medical risk to Plaintiff as a result of his fall, or due to the fact his sling was removed, or a referral to another bone specialist was not made.

57. Acromioclavicular joint osteoarthrosis is a chronic disease and does not occur as the immediate result of a traumatic injury.

58. At all times, relevant hereto, Plaintiff had no visible serious medical needs that were apparent to me, nor did I know of any serious medical need.

Sworn to this First (01)
Day of November, 2002

Joseph Mataloni
Corrections Health Care Administrator
SCI-Retreat
PA Department of Corrections

EXHIBIT

C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHAN HUE,                                    :
                                             :
    Plaintiff,                       :        Civil No. 01-CV-1064
                                             :
    v.                               :        (Judge Yvette Kane)
                                             :
JAMES UPDIKE, et al.,                        :        (Magistrate Judge J. Andrew Smyser)
                                             :
    Defendants.                      :

### Declaration of Joseph Giza

I, Joseph Giza, declare under penalty of perjury that the following facts are true and correct based upon my personal knowledge:

1.  At all times relevant hereto, I have been employed as the Corrections Employment/Vocational Coordinator at SCI-Retreat.  I have been so employed since 1987.

2.  My duties include: recommending work assignments and vocational/technical training for the development and implementation of individualized treatment plans for inmates.  My duties involved utilization of

inmate employees to fulfill the needs of institutional activities in a variety of occupational areas. Work involves identifying and resolving a variety of problems associated with screening and placing inmates into appropriate jobs based on their skills required in the job assignments, the limitations imposed by the inmates physical and psychological conditions, and the impact of the inmates prescriptive program plans on job placement. The job includes accountability for the inmate payroll and compensation system ensuring that inmate job assignments and payment for work performed are accomplished in accordance with agency policies and guidelines.

3.    I am aware of the allegations raised by Phan Hue in relation to his having to work while injured during the period March 2000 through the filing of his complaint in June 2001.

4.    I make job assignments at SCI-Retreat based on individualized treatment plans and the overall needs of the facility. Vacant positions are filled by the most qualified inmates. Those inmates who have been in job related training programs or have had prior experience in specific jobs, and whose work has been satisfactory, are given preference for assignments. Waiting lists are utilized.

5.    I am aware of the job duties associated with each job at the institution.

6.  Plaintiff's job assignments have been: Block worker from July 27, 1999 to November 1, 1999, Kitchen from November 2, 1999 to February 4, 2001 and Laundry from February 5, 2001 to Present.

7.  Plaintiff requested to be assigned to the Plumbing Shop on December 18, 1999 and to the Laundry on May 5, 2000. He requested to be placed on the waiting lists via Inmate's Request to Staff Member (DC-135A).

8.  Kitchen assignments are mandatory for those inmates who are medically cleared for food service work.  Varied duties are assigned by the kitchen supervisor, daily.

9.  Inmates are placed on a waiting list for a job by completing a form given to them by myself at Initial Reception. If they choose to change waiting lists, they have to fill out an Inmate Request to Staff Member (DC-135A).

10.  As a kitchen worker, Plaintiff would be expected to perform any and all duties assigned to him by the kitchen staff.  Inmates assigned to the kitchen start at entry-level pay $.19 an hour.

11.  As a laundry worker Plaintiff would be expected to perform any and all duties assigned to him by the laundry staff.

12.  Inmates who work in the laundry (Correctional Industries) can also earn additional monies because of the bonus system used by Correctional Industries. This is unique to Correctional Industries and bonuses are not

provided in the kitchen area.  This makes working in the laundry a very desirable job for all inmates.

13.  Plaintiff was assigned to the laundry area on February 5, 2001.  That assignment was made by me due to an opening becoming available at that time.  Plaintiff was next on the list for this position.  Jobs are assigned when an inmates name reaches the top of the waiting list.  He also was interviewed by the laundry supervisor prior to being assigned.

14.  I was not asked by anyone to provide this job to Plaintiff, nor was I aware at any time that Plaintiff was contemplating filing a lawsuit against anyone at the institution.

15.  My records show Plaintiff was paid for his work in the kitchen on the following dates:  February 2000- 110.50 hrs., $22.10; March 2000- 84 hrs., $16.80; April 2000- 0 hrs. reported, no pay; May 2000- 78 hrs., $15.60; 20; June 2000- 84 hrs., $16.80; July 2000 -88 hrs., $17.60; August 2000- 84 hrs., 16.80; September 2000- 54 hrs., $10.80; October 2000- 96 hrs., $20.16; November 2000- 140 hrs., $29.40; December 2000- 164 hrs., $37.72; January 2001- 144hrs., $33.12;  February 2001- 6 hrs., $1.38.

16. Plaintiff was not paid from May 15, 2000 to May 16, 2000 and September 12, 00 to September 14, 2000 because of a medical lay-in. From August 31, 2000 to September 6, 2000 Plaintiff was not paid because of being on cell restriction.

17. A medical lay-in is when the medical staff determines an inmate cannot work because of illness or injury for a specified period of time.

18. I am not aware that Plaintiff had any difficulties performing his duties in the kitchen during the period March 2000-February 2001. If Plaintiff had problems performing his duties, this would have been taken into consideration in assigning him to the laundry position. (see para. 4)

19. Plaintiff never contacted me to say he was having difficulties with his job or to have his job assignment changed.

20. It is normal practice for me to receive notice of lay-in of workers in order that I can record them on the Daily Movement Report for distribution to appropriate staff. This notice is provided by e-mail from the medical department.

21. I received notice of a medical lay-in for Plaintiff only for the following dates: May 15, 2000 to May 16, 2000 and September 12, 2000 to September 14, 2000. I have received no other lay-in's for Plaintiff.

22. I am not aware of any job restrictions, which may have been placed on Plaintiff.

23. I am aware that Plaintiff was also attending classes. These classes were held three days a week, February 14, 2000 until April 5, 2000. Beginning April 6, 2000 classes were five days a week and Plaintiff was enrolled March 1, 2000.

24. I have never had a discussion with Plaintiff regarding his job assignments or his job duties.

25. To the best of my knowledge, information and belief Plaintiff never requested to speak with me about these work assignments.

26. My files on Plaintiff contain no information about an injury, whatsoever.

27. I have never received complaints from supervisors of Plaintiff regarding his performance of duties.

28. Since being assigned as a laundry worker, Plaintiff has been promoted to a laundry worker II.

Sworn to this 7 7h
Day of ~~August~~, 2002
     NOVEMBER

_____
Joseph Giza
Employment/Vocational Coordinator
SCI-Retreat
PA Department of Corrections

6

EXHIBIT

D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHAN PHAN,                           :
                                     :
    Plaintiff,   :       Civil No. 01-CV-1064
                                     :
    v.           :       (Judge Kane)
                                     :
JAMES UPDIKE, et al.,                :       (Magistrate Judge Smyser)
                                     :
    Defendants.  :

### Declaration of Edward O'Brien

I, Edward O'Brien, declare under penalty of perjury that the following facts are true and correct based upon my personal knowledge:

1. I am the Food Services Manager at SCI-Retreat and have been so employed since July 1987.

2. My duties include: direct food service operation for an 832-inmate facility plus approximately 300 employees. I have 16 subordinate employees, three of which are food service supervisors. I purchase food and equipment for the

kitchen at SCI-Retreat. I also supervise inmates assigned to work in the kitchen.

4.  I am aware of the complaint filed by Phan Hue, Plaintiff and his allegations that I forced him to work and denied his injury.

5.  I am aware Plaintiff fell in the kitchen on February 28, 2000.

6.  I recall Plaintiff returned to work in the kitchen sometime in March 2000 after the fall.

7.  He was assigned light duty, said duty included: serving food on the mainline, cleaning work surfaces and such. Duties are assigned daily. There are a number of things a person can do, even with a sling or sore shoulder.

8.  During the period of March 2000 through May 6, 2001, I never had a personal conversation with Plaintiff, to the best of my information, knowledge and belief.

9.  Plaintiff did not discuss his inability to perform duties in the kitchen with me, at any time. Nor am I aware of any conversations he had with my staff.

10.  Plaintiff failed to show for work on April 28, 2000 and his block was called.

11.  On May 8, 2000 I received the Request to Staff form dated May 6, 2000 from Plaintiff. He indicated he was in pain and could not work. He requested light duty. This is the first time I had received such a request from Plaintiff.

12. I have no other written communications from Plaintiff at all, to include March 2000-June 2001.

13. In response to this Request to Staff, I called Mr. Hazlak, Phan's unit manager, to determine if Plaintiff had a medical lay in or work restrictions.

14. Mr. Hazlak indicated there were no medical lay-ins or work restrictions. Therefore, I told Plaintiff he would have to work that day, May 8, 2000 as the medical records did not indicate he was unable to work.

15. On May 15, 2000 I issued a lay-in to Plaintiff, out of caution, due to his complaints to me, in spite of there being no medically supported reason to do so. I instructed Plaintiff to go to medical to get a medical lay-in. I documented the lay-in on May 25, 2000 indicating he was not to return to work May 25-July 28, 2000.

16. I can order a lay-in for persons hurt on the job, to attend programs, for medical sign-ups, or as discipline.

17. Plaintiff returned to work in the kitchen on July 29, 2000 without incident. I have had no contact with Plaintiff about his injury since May 2000.

18. I have never received a grievance from Plaintiff nor have I received any notice of complaints made by Plaintiff about me.

19. At no time did I check up on Plaintiff to ensure he was ill during the period of May 2000-July 2000.

3

20. At no time did I insist Plaintiff perform duties which he told me he could not do.

21. The first, and only, occasion I received a request from Plaintiff to get off work was May 6, 2000.

22. At no time did I force Plaintiff to work. If Plaintiff fails to show for work our policy is to issue a misconduct. DC-ADM 816.

23. At no time was I aware, or able to discern on my own, any medical condition of Plaintiff that indicated he may be unable to perform <u>any</u> duties or would require medical attention.

24. At no time was Plaintiff placed in a work assignment that could be considered hazardous to his health or safety. On the contrary any work assignments are made in accordance with medical clearances issued by medical department.

25. At no time did I deny Plaintiff access to medical care or prevent his receiving medical treatment.

26. I was unaware at all times, until the filing of this suit that Plaintiff had intentions of filing suit against the Department for conditions of the workplace or for any other reason.

Sworn to this ___1 ST___
Day of November, 2002

Edward O'Brien
Edward O'Brien

4

Food Service Manager
SCI-Retreat
PA Department of Corrections

EXHIBIT

exhibit

E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHAN HUE,                          :
                                   :
    Plaintiff,               :        Civil No. 01-CV-1064
                                   :
    v.                       :        (Judge Yvette Kane)
                                   :
JAMES UPDIKE, et al.,              :        (Magistrate Judge J. Andrew Smyser)
                                   :
    Defendants.              :

## Declaration of Dale T. Hazlak

I, Dale T. Hazlak, declare under penalty of perjury that the following facts are true and correct based upon my personal knowledge:

1.     I am a Unit Manager on A Unit at SCI-Retreat.

2.     I became civil service certified on or about September 27, 1992 for the position of Unit Manager and was appointed on or about October 1992.

3.     I am familiar with Hue Phan since he has been housed on my Unit since his transfer from Camp Hill to SCI-Retreat on July 27, 1999. He has met with me in the course of typical correctional functioning.

4.  I am aware that Mr. Phan has filed a suit against me in Federal Court and I am aware that he alleges that I forced him to work in spite of his alleged injuries.

5.  As Unit Manager, my duties include: developing and establishing work assignments and case loads of the unit team members, monitoring to ensure unit security, maintaining unit sanitation and safety standards, scheduling and chairing weekly unit staffing's, providing supervision and technical support with case management to counselors and clerical staff, providing leadership in solving day to day inmate problems, providing assistance through a variety of means including counseling and referral services.

6.  Concerning Mr. Phan's alleged injury, the DC-14 case file reflects that Mr. Phan was admitted to the Institutional Infirmary on February 28, 2000 and returned to the Unit on February 29, 2000. Information from the medical/injury report notes that he was placed in the infirmary for 23-hour observation.

7.  The process used by an inmate to request a visit to the medical department is as follows: They can sign up for sick call on the Unit prior to 0700 hours on any day Monday through Friday and they will be scheduled. If illness or injury occurs after 0700, the inmate can approach staff members and request to be seen, then he will be sent to medical. This process was used

2

throughout the time involved here. At no time was Mr. Phan denied access to medical care or treatment or prevented from seeking it.

8. I am aware of the fall that Mr. Phan had on March 28, 2000 through his counselor at the time, Mrs. Simmons, who conducted a post infirmary interview.

9. On March 8, 2000, I interviewed Mr. Phan for the purpose of conducting a six-month counselor interview. During that interview, we discussed his injury. He said that it was healing and he was expecting to return to work in the near future. He was cooperative, polite and presented a positive attitude during the interview. I encouraged Mr. Phan to continue his positive adjustment and to continue to work with medical concerning his recovery from his injury.

10. Although I understand Mr. Phan says I spoke to him personally on many occasions regarding his shoulder injury, this is the only time I ever had direct conversation with him about the issue. I did dialogue with other staff, including kitchen staff, Mr. O'Brien and Mr. Mataloni (Medical) for the purpose of case management.

11. On February 29, 2000 I received a DC-134 (information report) from the medical department indicating that Mr. Phan was issued a sling for his right shoulder and it was authorized for seven days (February 29, 2000 – March 6,

2000). I received another DC-134 on March 3, 2000 authorizing a sling for his right arm for an additional seven days. I received another DC-134 on March 8, 2000 authorizing the sling for an additional two weeks. I received a DC-134 May 15, 2000 indicating that Mr. Phan had a work restriction; he could lift no more than ten pounds for two months

12. The purpose of my receiving the DC-134 is so that security staff will be alerted to the fact that the inmate has an item that has been authorized in his possession. Also, it allows the Unit Team to know the duration of his approval to have the item.

13. Inmates may contact staff through several means. One of those is to prepare a DC-135 (request to staff). For issues that deal with Unit Team concerns, inmates place completed DC-135's in a special mailbox designed specifically for that purpose. The Unit Clerk retrieves these daily Monday through Friday, date stamps them and gives them to me. I review them and disseminate them to the appropriate staff member for the necessary action. I received two of these request slips from Mr. Phan. The first was on December 13, 1999 dated March 11, 1999, in which he asks to see me about his work duty. His concern was a conflict between his school and his working time. Upon review it was determined that his work schedule would not interfere with his scheduled classes. The second one I received was on

February 28, 2001 dated February 26, 2001. His concern was about a stolen laundry bag. I resolved the matter by sending him to clothing exchange for replacement of items.

14. Requests for other staff members are handled by having inmates place materials for other staff, such as requests for activities, telephone etc. in one of two mailboxes in the unit. The unit clerk distributes these requests. This process was available to Mr. Phan at all times.

15. On April 28, 2000, Mr. Phan was issued a misconduct # A171986 written by Barry Horvath, Food Service Instructor. He was charged with Refusing to Work, Refusing to Attend School or Encouraging Others to do the same. The misconduct alleged that Mr. Phan claimed he was on a medical lay-in. Contact was made with the medical department to verify this and it was determined he was not on a medical lay-in and in fact there existed no reason in their records for him not to work. This misconduct was referred to my attention for consideration of an informal resolution of the matter. See Attachment 1.

16. Failure to work is a violation of prison policy. Work assignments and the expectation of inmates regarding their work assignments are governed by DC-ADM 816. The policy states: "that failure to report to or refusal to work is regarded as a misconduct. Absence from your job without prior

5

knowledge and permission from a staff member is not allowed."
DC-ADM 816, "Work Assignments."

17.   I saw Mr. Phan on May 1, 2000 to deal with the misconduct. I explained to Mr. Phan his options of either voluntarily participating in the informal resolution process or requesting that the misconduct be forwarded for a formal hearing by the Hearing Examiner.

18.   Mr. Phan explained he was concerned that if he elected to see the Hearing Examiner he would be placed in the Restricted Housing Unit because he had prior misconducts.  On December 18, 1999 he received Misconduct #A 168663 issued by CO I Henderson with a charge of Refusing to Obey an Order and Refusing to Work.   No sanction was imposed.  On February 17, 2000 he was issued a Misconduct #A 220353 by CO I Milbrodt with a charge of Refusing to Obey an Order and Smoking where Prohibited.  He was sanctioned with two days job suspension for the rule infractions.

19.   Mr. Phan also asked to have this misconduct formally resolved because he needed to continue to work as he had no other source of income and he needed funds to pursue his legal conviction appeal.  He asked that I resolve the matter without his needing to see the Hearing Examiner.

20.  I agreed to handle the misconduct informally and imposed a sanction of additional work duties (no compensation allowed), three days cleaning showers effective May 3, 2000 through May 5, 2000.

21.  The only formal action I could have taken was to refer the misconduct for a formal hearing. I have no authority to place an inmate in the RHU. Any sanction imposed, had that occurred, would be the decision of a Hearing Examiner.

22.  Mr. Phan did not complain of any medical problems at the time that we agreed upon the sanction. His medical clearance form dated July 27, 1999 noted no restrictions.

23.  I contacted Mr. Mataloni and he reported that there was no change and no medical restrictions were in place at the time of the informal resolution. He reported that Mr. Phan was seeing a physical therapist for an exercising regimen. There was no medical reason presented to me for Mr. Phan not working. Mr. Phan accepted the sanction imposed.

24.   On May 8, 2000 I was contacted by Edward O'Brien from the kitchen, who inquired as to any medical reason Mr. Phan could not work. I spoke with the medical department to confirm that he was not under any medical restrictions or lay-ins at the time. They indicated to me at that time there was no reason Mr. Phan could not work. This information was given to Mr. O'Brien.

25.   On May 30, 2000 I discussed Mr. Phan's work in the kitchen with Mr. O'Brien after I received a "Case Entry" authored by Mr. O'Brien dated May 25, 2000. In that conversation, Mr. O'Brien's concern was that although Mr. Phan had a work restriction of not lifting anything greater than ten pounds for two months, Mr. Phan still was cleared for assignment to the kitchen. I contacted Mr. Mataloni and was told that the work restriction did not mean that Mr. Phan was unable to work in the kitchen, that there may be duties he could perform within the limits of the restriction. Mr. O'Brien said he would continue Mr. Phan on the roster with pay but would not have Mr. Phan report for work, and that this would be in effect for eight weeks. I did ask Mr. Mataloni to schedule a follow-up medical evaluation of Mr. Phan. During this time, I made no attempts to have Mr. Phan work.

26.   My authority to authorize inmates not to work is limited for purposes of scheduled meetings, staffing, or to address an inmate requests.

27.   At no time did I force Mr. Phan to work.  He voluntarily agreed to the additional work duties that I imposed as a result of the informal resolution process.

28.   At no time did I interfere with Mr. Phan's ability to seek medical attention. It is my understanding that each time he signed up for sick call he was seen by someone in the medical department.

29.   I did not act in any way to retaliate against Mr. Phan, but rather acted in his best interest to provide him the opportunity to continue to earn pay.

30.   In all of my interviews, and interactions with Mr. Phan he seemed very capable of understanding the matters we discussed.   He seemed to understand English sufficiently to function well in the institution and to be certain his best interest was attended to.

31.   Mr. Phan is aware of the inmate request system (DC-135) and has used this system as supported by the requests I received from him on December 10, 1999 and February 26, 2001.

32.   At all times relevant hereto, I was unaware of Plaintiff's intentions to file suit against anyone at SCI-Retreat or the DOC.

33.    I had no conversations with Mr. Phan or written requests from Mr. Phan regarding his medical condition, subsequent to the May 1, 2000 misconduct resolution.

34.    Mr. Phan did not show any visible signs that he was unable to work after the removal of the sling.


Sworn to this 8th
Day of August, 2002

_____
Dale T. Hazlak
Unit Manager
SCI-Retreat
PA Department of Corrections

ATTACHMENT 1

2

FORM DC-141    PART I    COMMONWEALTH OF PENNSYLVANIA    **A** 171986
Rev. 6-84

☐ MISCONDUCT REPORT ☐ OTHER    DEPARTMENT OF CORRECTIONS

| DC Number DY0577 | Name Phan | Institution SCI-Retreat | Incident Time 24 Hr. Base 0630 | Incident Date 4/28/2000 | Date of Report 4/28/2000 |
| Quarters A-Block | Place of Incident Inmate Dining Hall | | | | |

**OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)**

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | Mr. Groboski | | X |
| | | | | | Ms. Kasprzyk | | X |
| | | | | | | | |

MISCONDUCT CHARGE OR OTHER ACTION Class I Cat B #39 Refusing to work, attend school or attend mandatory programs or encouraging others to do the same.

STAFF MEMBER'S VERSION    On above date and time inmate Phan was called to the kitchen to work and refused stating his shoulder was hurt and the hospital told him to lay in. On 4/27/2000 Inmate Phan had gone to sick call and the hospital called the kitchen and stated "There is no medical reason for Phan not to work." My supervisor Mr. Groboski talked to Ms. Kasprzyk about inmate Phan's condition and she is the one that stated he is fine.

IMMEDIATE ACTION TAKEN AND REASON    4-28-00 Refer to Unit Manager for informal Resolution

**PRE-HEARING CONFINEMENT**

| | IF YES | | |
|---|---|---|---|
| | TIME | DATE | |
| ☐ YES ☐ NO | | | FORMS GIVEN TO INMATE ☐ REQUEST FOR WITNESSES AND REPRESENTATION    ☐ INMATE'S VERSION |

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY    SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| | | DATE | TIME 24 HOUR BASE |
| B. Howarth    F.S.I. | Capt Wild | |

| YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER | | Misconduct Category | Signature of Person Serving Notice |
| DATE | TIME | ☑ CLASS I  ☐ CLASS 2 | |
| 4-29-00 | 0900 | | |

**NOTICE TO INMATE**

You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class I misconduct, any pre-release status you have will be revoked.

WHITE—DC-15    YELLOW—Inmate Cited    PINK—Staff Member Reporting Misconduct    GOLDENROD—Deputy Superintendents

**EXHIBIT**

D

**DC-14**

**CUMULATIVE
ADJUSTMENT RECORD
SCI-Retreat**
Institution

**COMMONWEALTH OF P**
**Department of C**

**A UNIT**

| Institutional Number | PBPP NUMBER | NAME: Phan, Hue |
|---|---|---|
| DY0577 | | |

| Date | OBSERVATION |
|---|---|
| 01MAY00 | **INFORMAL RESOLUTION**

Inmate was seen today to conduct an informal resolution of misconduct 171986 Class 1, Category B, #39 Refusing to work, attend school or attend mandatory programs or encouraging others to do the same.
Phan said that he wants to work and wants to resolve the matter without needing to see the hearing examiner. After discussing the situation the decision is to informally resolve the misconduct. Inmate will return to work in the kitchen and is sanctioned to **3 days of cleaning the Unit showers effective 03MAY00 through 05MAY00. He will receive no pay for cleaning the showers.**
I contacted Mr. O'Brien and informed him of the outcome of this hearing. The paperwork was sent to Mr. Luzney for computer entry.
Mr. Giza was also sent a copy of the disposition.


*Dek T. Hill*

Unit Manager |

| DC-141 Rev. 6-84 DISCIPLINARY HEARING REPORT | PART II B | | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS | | | |
|---|---|---|---|---|---|---|
| DC Number DY0577 | Name Phan | | Institution SCI RT | Hearing Date 01 May 00 | Hearing Time 1300 hrs | No. from Part I 171986 |
| INMATE PLEA | ☐ Guilty ☐ Not Guilty | ☐ No Plea ☐ Other | Verdict | ☐ Guilty ☐ Not Guilty | ☒ informal Resolution | |

### HEARING ACTION

CHARGES   Class I Category B #39, Refusing to work

### FINDINGS OF FACT, VERDICT, AND SANCTIONS IMPOSED

01 May 00

This is an informal resolution

Return to work in kitchen

and

3 days of cleaning Showers, Ø pay

effective May 3, 2000 through May 5, 2000

| | | |
|---|---|---|
| ☐ YES   ☐ NO | The inmate has heard the decision and has been told the reason for it and what will happen. | |
| ☐ YES   ☐ NO | The circumstances of the charge have been read and fully explained to the inmate. | SEE APPENDICES |
| ☐ YES   ☐ NO | The opportunity to have the inmate's version reported as part of the record was given. | ☐ |
| ☐ YES   ☐ NO | The inmate has been advised that within 15 days a request for a formal review may be submitted and that this request must contain specific reasons for the review. | |

| NAME(S) OF HEARING EXAMINER/COMMITTEE (TYPED OR PRINTED) | Hearing Report and all appended information must be signed. Signature indicates finished report with appendices. |
|---|---|
| Dave T. Horluk Unit Manager | _signature_ SIGNATURE OF HEARING EXAMINER/COORDINATOR |

## Internal Resolution Action Form

| Inmate Name (Printed) | Inmate Number | DC-141 Part 1 Number | Date: |
|---|---|---|---|
| Phan | ΔY 0577 | 171 986 | 01 May 00 |

| Action Taken | | | |
|---|---|---|---|
| ☐ No Action | | | |
| ☐ Reprimand and Warning | | | |
| ☐ Referred to Hearing Examiner | | | |
| ☐ Cell Restriction (Up to 7 days) | Number of Days: | Start Date: | End Date: |
| Loss of Privileges: (Up to 7 days) ☐ Telephone ☐ Yard ☐ Day Room ☐ Other: | Number of Days: | Start Date: | End Date: |
| ☐ 1 Week Loss of Commissary | | Start Date: | End Date: |
| ☑ Assignment of Additional Work Duties (No 3 Day Stones compensation allowed) | Assignment Clean Stones | Start Date: 03 May 00 | End Date: 05 May 00 |
| ☐ Restitution for Damaged/Destroyed State Items/Property | Item(s) | Amount to be Paid: | |

Dale T. HAZLAK
**Unit Manager's Name (Printed or Typed)**

_____  01 May 00
**Unit Manager's Signature    Date**

X _____  5/1/00
**Inmate Signature    Date**

cc: DC-14 (original)
    Hearing Clerk

Attachment C

Get a Document - by Party Name - Wilson AND Wigen



Source: Legal > / . . . / > **Federal & State Cases** ⓘ
Terms: **name(wilson and wigen)** (Edit Search)

↙ Select for FOCUS™ or Delivery
☐

*1998 U.S. Dist. LEXIS 5792, \**

EDDIE C. **WILSON**, SR., Plaintiff, v. GEORGE **WIGEN**, et al., Defendants. EDDIE C. **WILSON**, SR., Plaintiff, v. UNITED STATES OF AMERICA, Defendant.

CIVIL ACTION NO. 96-0620, CIVIL ACTION NO. 96-1241

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1998 U.S. Dist. LEXIS 5792

April 24, 1998, Decided
April 24, 1998, Filed, Entered

**DISPOSITION:** [\*1] Motion for Summary Judgment of all Defendants in these consolidated actions GRANTED. Judgment ENTERED in favor of all Defendants and against Plaintiff, Eddie C. Wilson, Sr.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff prisoner brought two separate actions against defendants, prison officials, prison physicians, and the United States, claiming a violation of his constitutional rights and under the Federal Tort Claims Act (FTCA). The court consolidated the actions, and ruled on previous motions for summary judgment and to dismiss. The court then considered defendants' motion for summary judgment on the remaining issues.

**OVERVIEW:** The prisoner claimed defendants refused to continue a prescription he was prescribed before he was incarcerated, failed to provide required therapy on his hip after hip surgery, denied him a lower bunk assignment, and sent him to work while he was on medically unassigned status. The court granted the motion for summary judgment. The court found that the prison physicians' decision not to prescribe medication was a calculated medical decision made to balance the difference between the level of treatment of the prisoner's asthma and the prevention of further damage to his hips. Where the prisoner received some care, inadequacy or impropriety of the care that was given would not support an Eighth Amendment claim. The prisoner presented no admissible evidence that therapy was ordered nor evidence of a causal connection between the lack of therapy and the need for additional surgery, or that the upper bunk assignment contributed to his hip problems. There could be no Eighth Amendment violation without proof of injury. The prisoner failed to present medical expert evidence as required to establish a claim of medical malpractice, therefore, the FTCA claim also failed.

**OUTCOME:** Defendants' motion for summary judgment was granted and judgment was entered in favor of all defendants against the prisoner.

**CORE TERMS:** summary judgment, bunk, hip, therapy, asthma, surgery, work assignment, prescribed, unassigned, medically, presenting evidence, consolidated, medication, prisoner, arrived, inmate, walk, upper, medical treatment, maltreatment, incarcerated, replacement,

Get a Document - by Party Name - Wilson AND Wigen

transferred, deposition, Eighth Amendment, deposition testimony, proximate cause, uncontradicted, degeneration, malpractice

## CORE CONCEPTS - ◆ Hide Concepts

Criminal Law & Procedure : Postconviction Proceedings : Imprisonment & Prisoner Rights
⚓Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim.

Criminal Law & Procedure : Postconviction Proceedings : Imprisonment & Prisoner Rights
⚓A prisoner cannot prove an Eighth Amendment violation without some proof of an injury as a result of prison officials' actions.

Civil Procedure : State & Federal Interrelationships : Application of State Law
Torts : Public Entity Liability : Claim Presentation
Governments : Federal Government : Claims By & Against
⚓The United States is subject to claims under the Federal Tort Claims Act where a similarly situated private party would be liable. 28 U.S.C.S. § 2674. Accordingly, the court looks to applicable state law to determine the liability of the United States.

Evidence : Witnesses : Expert Testimony
Torts : Malpractice Liability : Healthcare Providers
⚓To establish a claim of medical malpractice under Pennsylvania law, a plaintiff must prove 1) a duty owed to the plaintiff by a physician, 2) a breach of that duty by the physician 3) that the breach of the duty was the proximate cause, or a substantial factor in causing plaintiff's harm and 4) damages suffered by the plaintiff that were a direct result of the harm. A plaintiff is also required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm.

**COUNSEL:** EDDIE C. WILSON, SR., PLAINTIFF, PRO SE, BALTIMORE, MD USA.

For GEORGE WIGEN, GEORGE NYE, JESUS VASQUEZ, DAVE MALINOV, DR., DR. E. RUNKLE'S ESTATE, DEFENDANTS: SUSAN SHINKMAN, U.S. ATTORNEY'S OFFICE, PHLA, PA USA. JAMES G. SHEEHAN, ASSISTANT U.S. ATTORNEY, PHLA, PA USA.

**JUDGES:** JAMES McGIRR KELLY, J.

**OPINIONBY:** JAMES McGIRR KELLY

**OPINION:**

**MEMORANDUM AND ORDER**

**J. M. KELLY, J.**

**APRIL 24, 1998**

Defendants in these consolidated actions have filed the present Motion for Summary Judgment on all remaining counts in both actions. While Plaintiff, Eddie C. Wilson, Sr. ("Wilson"), has not filed a response to this Motion for Summary Judgment, Wilson has previously created an extensive record in this matter which will be considered in opposition to the Motion for Summary Judgment.

## PROCEDURAL BACKGROUND

Wilson filed Wilson v. Wigen, et al., Civil Action No. 96-0620, in January 1996, alleging that Defendants George Wigen ("Wigen"), George Nye ("Nye"), Dr. E. Runkel ("Runkel"), Jesus **[\*2]** Vazquez ("Vazquez") and Dr. David Malinov ("Malinov"), had violated his constitutional rights while he was a prisoner at the Federal Correctional Institution at Schuylkill ("Schuylkill"). In August 1996, Wilson filed an amended complaint which added allegations from events that took place in 1996. Wilson subsequently filed Wilson v. United States, Civil Action No. 96-1421, in October 1996, alleging claims against the United States under the Federal Tort Claims Act ("FTCA").

Defendants in Wilson v. Wigen filed a Motion to Dismiss, or in the alternative, for Summary Judgment. Wilson filed a Cross-motion for Summary Judgment. As a result of the Court's disposition of those motions on March 31, 1997, the following causes of action remain in Wilson v. Wigen: 1) Wilson's medical maltreatment claims against Defendants Runkel and Malinov for their interference with Wilson's treatment in not continuing his Prednisone prescription and not providing the proper therapy and work status following Wilson's hip replacement surgery. 2) Wilson's medical maltreatment claim against Vazquez, and in one instance, Nye, as to their interference with prescribed medical treatment in not assigning **[\*3]** Wilson to a lower bunk and requiring him to walk to a work assignment while on medically unassigned status. 3) Wilson was also allowed to conduct discovery as to whether Vazquez' denial of a lower bunk and disciplinary action by Wigen, Nye and Vazquez were the result of racial discrimination.

The United States moved to dismiss in Wilson v. United States based upon Wilson's failure to exhaust administrative remedies under the FTCA. Wilson filed a Cross-motion for Summary Judgment. The Court's disposition of these motions resulted in the following negligence claims remaining in Wilson v. United States: 1) failure to timely transfer Wilson for hip surgery, 2) Wilson's assignment to a top bunk and 3) Wilson's assignment to a second floor room which forced him to walk a great distance to work.

Wilson v. United States was transferred from the docket of the Honorable Clarence C. Newcomer to my docket and I ordered the cases consolidated on April 30, 1997. Discovery has proceeded and was scheduled to be completed on October 6, 1997. On October 7, 1997, the Court granted Defendants' Motion to Compel and ordered Wilson to respond to Defendants' Interrogatories within twenty days. **[\*4]** When Wilson still did not respond to the Interrogatories, the Court granted Defendants' Motion for sanctions on November 24, 1997. As a result, Wilson is precluded from 1) presenting evidence of white inmates receiving lower bunks at Schuylkill, 2) presenting evidence of discrimination, other than individuals who were named in Wilson's deposition of October 1, 1997, 3) presenting evidence of retaliation in the disciplinary process, other than individuals named in Wilson's deposition and 4) presenting evidence of the conversation alleged in paragraph 43 of the Amended Complaint.

## FACTUAL BACKGROUND

The factual background in this matter was set forth extensively in the Court's Memorandum & Order of March 31, 1997 in Wilson v. Wigen and need only be briefly set forth here. Wilson was incarcerated at Schuylkill in November of 1994. At that time, Wilson was diagnosed with asthma and aseptic necrosis of both hips. Wilson had several medications to control his asthma when he came to Schuylkill, including Prednisone. Medical staff at Schuylkill prescribed asthma medications to Wilson, but not Prednisone.

Upon arrival at Schuylkill, Wilson was to be assigned to a lower bunk. **[\*5]** When he arrived at the unit, no lower bunk was available. Vazquez asserts that he offered to move another

prisoner from a lower bunk but Wilson refused, preferring to not rock the boat. Wilson testifies that Vazquez told him he would have to wait until another bunk became available, then other new white inmates were assigned to lower bunks while Wilson continued to wait. On this Motion for Summary Judgment, the Court must accept Wilson's version. n1

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 The legal standards for the claims in Wilson v. Wigen were set forth in the Court's March 31, 1997, Memorandum and Order in that matter.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - -

In May 1995, Wilson was examined by an orthopedic surgeon who recommended that both of Wilson's hips be replaced. In July 1995, Wilson was transferred to a medical center for federal prisoners in Springfield, Illinois and he received hip replacement surgery on both hips. He returned to Schuylkill on March 27, 1996.

Following his return to Schuylkill, Wilson was on medically unassigned work status from April 1 through  **[*6]**  June 30, 1996.

Despite his medically unassigned status, Vazquez ordered Wilson to a work assignment on April 22, 1996. Vazquez' order was confirmed by Nye. Upon reaching his work assignment, Wilson was told to return to his block because of his medically unassigned status. Vazquez then ordered Wilson to report the next morning for an administrative work assignment. Wilson placed an unauthorized three-way call through his family to the office of the Regional Counsel and received a thirty day suspension of his telephone privileges. Wilson claims that the thirty day telephone suspension was disproportionately greater than punishment white inmates received for similar offenses.

Wilson suffered repeated asthma attacks. Wilson suffered an asthma attack which lead to full respiratory arrest on July 2, 1996. As a result, he spent a week in the ICU at Pottsville Hospital.

## DISCUSSION

### A. Medical Maltreatment

1. Runkel's Death

It is undisputed that Runkel died before Wilson was transferred back to Schuylkill in March 1996. Accordingly, Runkel cannot be liable for any harms alleged by Wilson that took place after March 1996.

2. Prednisone

In response  **[*7]**  to Defendants' previous Motion for Summary Judgment, Wilson presented evidence that he had been prescribed Prednisone before he was incarcerated at Schuylkill, but that Malinov and Runkel refused to continue that prescription. Since Wilson suffered a full respiratory arrest related to his asthma, he presented a compelling argument that Defendants interfered with his prescribed medical treatment knowing that it would cause him pain. Wilson bolstered this argument with a letter from Judge Kline of the District of Maryland, drafted to alert prison officials of the need to allow Wilson to have his asthma medication. Despite the evidence presented by Wilson, Defendants chose not to address the issue of interference with Wilson's prescribed course of medication. Rather, Defendants' previous Motion for Summary Judgment was solely based upon what they perceived as a difference of opinion between Wilson and Defendants as to Wilson's course of treatment.

Consequently, the Court denied the Motion for Summary Judgment.

Malinov now states that the decision not to prescribe Prednisone was based upon the potential side effects associated with Prednisone. One such potential side effect is the degeneration **[*8]** of bones, a problem that Wilson already had when he arrived at Schuylkill. In fact, Wilson states in his deposition testimony that before he arrived at Schuylkill, his doctors had advised him that the degeneration of his hips was associated with his use of Prednisone. Based upon the additional evidence now presented to the Court, it can only be said that the decision not to prescribe Prednisone was a calculated medical decision with which Wilson does not agree. More clearly than in the typical situation where an inmate alleges that additional medical attention should have been provided to him, Runkel and Malinov were forced make a reasoned medical decision to balance the difference between the level of treatment of Wilson's asthma and the prevention of further damage to his hips. See Norris v. Frame, 585 F.2d 1183, 1186 (3d Cir. 1978) ("Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim." ). This is not a constitutional violation and summary judgment shall be granted to Runkel and Malinov on this issue.

3. Hip Therapy

Wilson contends that Malinov failed to provide required therapy **[*9]** on his hip upon his return to Schuylkill in March 1996. On October 16, 1996, Wilson was seen by an orthopedic surgeon who diagnosed scar tissue and calcium build-up on Wilson's left hip. Wilson now needs additional hip surgery. Review of Wilson's medical records reveals no order for therapy upon his return to Schuylkill and Wilson admits that Schuylkill did not have the therapy facilities he believes he required. Wilson's statement linking the lack of therapy to the need for additional surgery is hearsay and therefore inadmissible. Wilson has presented no admissible evidence of this doctor's statement. Since there is neither evidence that therapy was ordered nor evidence of a causal connection between the lack of therapy and the need for additional surgery, Malinov's Motion for Summary Judgment shall be granted on this issue.

4. Work Status

There is no evidence that Wilson had any work status other than medically unassigned from April 1, 1996 through June 30, 1996. There is also no evidence that Malinov participated in any way in the decision to require Wilson to report to work on April 22, 1996. Accordingly, summary judgment shall be granted to Malinov on this issue.

**[*10] B. Interference with Prescribed Treatment**

1. Lower Bunk Assignment

There is sufficient evidence in the record that Vazquez denied a lower bunk assignment to Wilson, in contravention of a medical order. Wilson has presented no evidence that his hips were injured or worsened by using the upper bunk. While Vazquez' actions, if believed, are not to be commended, Wilson cannot prove an Eighth Amendment violation without some proof of an injury as a result of Vazquez' actions. See Monmouth County Correctional Institute Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (medical maltreatment injury requires unnecessary or wanton infliction of pain or lifelong disability or handicap). It is uncontradicted that Wilson arrived at Schuylkill with badly degenerated hips and he testified at his deposition that he tried to have his hip replacement surgery before he was incarcerated. Since Wilson has presented no evidence of a constitutional injury related to his upper bunk assignment, summary judgment shall be granted to Vazquez on this issue.

2. April 22, 1996 Work Assignment

Wilson has presented no evidence of a constitutional injury related to his being sent **[*11]** to work while on medically unassigned status on April 22, 1996. While these actions by Vazquez and Nye are uncontradicted on the record and not to be commended, summary judgment must be granted in their favor.

## C. § 1981 Allegations

In the Court's Memorandum and Order of March 31, 1997, Wilson was given the opportunity to develop evidence of disproportionate treatment in the assignment of lower bunks and in disciplining prisoners. Wilson has presented no such evidence to the Court and is, in fact, barred from presenting further evidence on this issue by the Court's Order of November 24, 1997. As a result, Wilson cannot sustain his § 1981 claim and summary judgment shall be granted to Wigen, Nye and Vazquez on this issue.

## D. FTCA Claims

⚓The United States is subject to claims under the FTCA where a similarly situated private party would be liable. 28 U.S.C. § 2674. Accordingly, the Court looks to applicable state law to determine the liability of the United States. While Wilson claims he was injured by the negligence of the United States in his medical treatment, in essence, his claims are that the individuals responsible for his treatment committed **[*12]** malpractice.

⚓To establish a claim of medical malpractice under Pennsylvania law, a plaintiff must prove 1) a duty owed to the plaintiff by a physician, 2) a breach of that duty by the physician 3) that the breach of the duty was the proximate cause, or a substantial factor in causing plaintiff's harm and 4) damages suffered by the plaintiff that were a direct result of the harm. Mitzelfelt v. Kamrin, 526 Pa. 54, 62, 584 A.2d 888, 891 (1990), citing Morena v. South Hills Health Sys., 501 Pa. 634, 462 A.2d 680 (1983). "A plaintiff is also required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm." Mitzelfelt, 526 Pa. At 62, 584 A.2d at 892, citing Brannan v. Lankenau Hosp., 490 Pa. 588, 417 A.2d 196 (1980). Wilson has presented no expert medical evidence in this matter. Therefore, summary judgment must be granted in Wilson v. United States on all claims.

## CONCLUSION

Summary judgment shall be granted in favor of Defendants on all counts in these consolidated Complaints. **[*13]** Any claims against Runkel after his death must obviously fail. Defendants have now presented evidence, including Wilson's deposition testimony, from which the only inference that may be drawn is that Runkel and Malinov made a reasoned medical judgment in not prescribing Prednisone to Wilson. Also, there is no evidence that Malinov failed to provide prescribed therapy to Wilson or in any way participated in forcing Wilson to walk to work on April 22, 1996. Further, Wilson has presented no evidence to support his claim that he was injured by an upper bunk assignment or by being forced to walk to a work assignment on April 22, 1996, as well as no evidence of disparate treatment in the assignment of bunks or punishment. Finally, Wilson has failed to produce expert testimony required to support his malpractice claims against the United States.

## ORDER

AND NOW, this 24th day of April, 1998, upon consideration of the Motion for Summary Judgment of all Defendants in these consolidated actions, and the record in these matters, it is ORDERED that the Motion for Summary Judgment is GRANTED. Judgment is ENTERED in this matter in favor of all Defendants and against Plaintiff, Eddie C. Wilson, **[*14]** Sr. These

matters are now closed.

BY THE COURT:

JAMES McGIRR KELLY, J.

    Source: Legal > / . . . / > **Federal & State Cases** ⓘ
    Terms: **name(wilson and wigen)** (Edit Search)
      View: Full
Date/Time: Saturday, August 10, 2002 - 2:15 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

EXHIBIT

G

1        IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3   PHAN HUE,                        :

4            Plaintiff,              :       CIVIL ACTION -- LAW

5        vs.                         :       JURY TRIAL DEMANDED

6   JAMES UPDIKE, JOSEPH             :
    MATALONI, EDWARD O'BRIEN,        :
7   DALE HAZLAK,                     :

8            Defendants.     :   NO.: 1:-CV-01-1064
    :::::::::::::::::::::::::::::::::::::::::::::::::::::::

9

10

11

12

13                    DEPOSITION TRANSCRIPT

14

15           Testimony taken at the Deposition of

16   PHAN HUE, on Wednesday, July 31, 2002, commencing at

17   11:48 a.m., at the State Correctional Institute at

18   Retreat, Hunlock Creek, Pennsylvania.

19

20

21

22   _____

23              SUZAN LATONA REPORTING
              108 Main Street - Inkerman
24            Pittston, Pennsylvania  18640

25                  

1    was hurt at.  I pointed to her to my shoulder.  I told

2    her I could not lift it up or put it down.  And she

3    hold my hand and lift it up and down.  And she heard

4    the bone -- the sound of broken bone.

5        After that she went to an office.  I was

6    lying on the bed, I saw her she went there.  And she

7    called the CO who brought me to the hospital.  And

8    they was talking to each other and after that she came

9    back.

10        The rotar cap (sic).  The doctor told me

11    that the shoulder, the rotar cap was trouble.  From

12    what I overheard, the doctor told the CO that this guy

13    needs to go see a bone specialist.  And I heard the CO

14    say okay.  And then I heard he told her that we will

15    inform the facility what's going on.

16        When I came back to the facility they let me

17    stay in one of the rooms for one night.

18        Q.    Well, he's answering much more than the

19    question, so why don't we break this down.

20        MR. DANG:  What do you want?

21        Q.    I'll continue to ask questions.

22        MR. DANG:  Okay.  Okay.  Sorry.

23        Q.    First of all, did the doctor speak

24    Vietnamese?

25        THE INTERPRETER:  No.

1    Q.    All right.    How did you communicate with her?

2         THE INTERPRETER:    Okay.    Because I can

3    understand somewhat English.    I can understand what a

4    doctor's saying but to a limited understanding but not

5    a whole lot.    Like you when you said I can understand

6    you, but not a whole lot.

7    Q.    How did you make it clear to the doctor what

8    you wanted to say?

9         THE INTERPRETER:    I understood what she

10   told when she talk about bones.    When what she say

11   about the bone specialist, I recalled and I remembered

12   the words but I could not understand what it was.    So

13   when I came back to the unit, I asked people what it

14   really meant and they explained it to me.

15   Q.    Who did you ask?

16        THE INTERPRETER:    The person who -- my

17   cellmate.

18   Q.    Who is your cellmate?

19   A.    Vogel William.    Vogel --

20        THE INTERPRETER:    How do you spell that?

21   A.    V-O-G-E-L W-I-L-L-A-M, I think.

22   Q.    It's William Vogel?

23        THE INTERPRETER:    Yeah.

24        MS. DAVIS:    Is the record reflecting that he

25   is doing the spelling?

1          THE COURT REPORTER:  Yeah.

2      Q.    Okay.  Could William Vogel translate

3  Vietnamese to English, English to Vietnamese?

4          THE INTERPRETER:  No, he's not Vietnamese,

5  he's Hispanic.  But he explained it to me.  He clearly

6  -- he tried to explain the meaning of the word, like

7  break it down for me so I can understand it easily.

8      Q.    Do you remember anything else that doctor

9  said in that sentence other than the words "bone

10  specialist"?

11          THE INTERPRETER:  The only -- when I was

12  laying in the bed and I heard the doctor said that

13  this guy needs this bone specialist.  That's the only

14  thing I can recall.  And after that I went back to the

15  cell and asked my cellmate just meant what it was.

16      Q.    What else did they do for you in the

17  emergency room?

18          THE INTERPRETER:  They did not do anything.

19      Q.    Did you get a shoulder harness or a sling?

20          THE INTERPRETER:  When I came back here,

21  they gave me the sling.

22      Q.    All right.  So that happened at the prison?

23          THE INTERPRETER:  After they gave me the

24  sling at the hospital and I came back here and I stay

25  here overnight and the next day they pulled my teeth

1       THE INTERPRETER:  I saw the nurse.

2   Q.   Do you know who?

3   A.   Diana, I think.

4       THE INTERPRETER:  Diana, I think.

5   Q.   Okay.  What did she do for you?

6       THE INTERPRETER:  He (sic) gave me a bag of

7   ice.

8   A.   Tylenol.

9       THE INTERPRETER:  Tylenol.  And something

10  else.

11  Q.   What, another medication or another object?

12      THE INTERPRETER:  Just medication.  And then

13  I stay here in the hospital in this room right here.

14  Stay there for one night.

15  Q.   And then what happened?

16      THE INTERPRETER:  And then after that they

17  send me to my block.

18  Q.   Well, where did your teeth get extracted?

19  A.   The next morning.

20      THE INTERPRETER:  The next morning.

21  Q.   Before they sent you back to your block?

22      THE INTERPRETER:  No.

23  Q.   That was after you went back to your block?

24      THE INTERPRETER:  They send me back to the

25  hospital.  I stay here for one night.  Next morning

57

1      and that person in higher position does not want to

2      spend money to fix my arm.   And that's what I thought.

3         Q.   So do you think that Mr. Updike was

4      personally trying to cause you pain or harm?

5            THE INTERPRETER:   Intention or not I'm not

6      sure, but all I know is that he took the sling off.

7      And then about two or three weeks later he took me off

8      from medication.

9         Q.   Okay.   You wanted to show us your injury.

10           (Witness showing Mr. Butkovitz his

11            shoulder.)

12           MR. DANG:  He wants you to feel it right

13     now.

14           THE INTERPRETER:   My initial intention was

15     only to make known to the people at the facility just

16     try to fix my injury.   That's all I want.   And there

17     was no intention of suing anybody to get money,

18     compensation or anything.   It was just try to fix my

19     shoulder.   That's all.

20           Because the grievances was put out so many

21     times and nothing was being done, and at first there

22     was no plan of monetary involved.   But they keep on

23     putting up and up until two years later and nothing

24     being done, so the people in the cell told me that,

25     you know, you have to do something about it in order

77

1    Q.    At the outside hospital did you see a male

2    doctor?

3        A.    No.

4            THE INTERPRETER:    No.

5        Q.    The female doctor that you spoke to, did she

6    speak directly to you?

7            THE INTERPRETER:    Yes, when I was laying on

8    the bed.

9        Q.    And you had no problem with that

10    conversation?

11            THE INTERPRETER:    When she speak fast, I

12    could not understand.

13        Q.    Did you ask her to slow down?

14        A.    Yeah.

15            THE INTERPRETER:    Yes.

16        Q.    And then you understood?

17            THE INTERPRETER:    Yes.

18        Q.    Did this doctor specifically say "bone

19    specialist"?

20            THE INTERPRETER:    I heard bone specialist

21    but I did not understand what it really means at that

22    time.    Until I came back to my cell and my cellmate --

23    I told my cellmate about the word bone specialist and

24    he helped me and looked up in the dictionary and he

25    pointed out to me and find out what it really means.

85

1    correct?

2        A.    Yeah.

3            THE INTERPRETER:  Yes.

4        Q.    Who was your counselor before that?

5            MR. DANG:  Before the fall?

6        Q.    Before Ms. Miller.

7            THE INTERPRETER:  I cannot recall that.

8        Q.    Who gave you the sling?

9            THE INTERPRETER:  I cannot recall who.

10       Q.    Did you get the sling at the outside

11   hospital or at SCI Retreat?

12           THE INTERPRETER:  I cannot recall.

13       Q.    Do you recall testifying just a little while

14   ago that you got it here as SCI Retreat?

15           THE INTERPRETER:  I wasn't sure which place

16   that gave me the sling.  But when I was sent out to

17   the outside hospital, I was only cuffed only one hand,

18   the other one was put on some type of sling.  But I

19   wasn't sure it was given here or outside.

20       Q.    Are you sure now?  Do you know?

21           THE INTERPRETER:  No.

22       Q.    Did you ever have to buy medication yourself

23   after you returned back to SCI Retreat?

24       A.    Yeah.

25           THE INTERPRETER:  Yes.

1    Q.    What did you buy?

2         THE INTERPRETER:  Ibuprofen, Tylenol,

3    Advil.

4    Q.    When did you buy that?

5         THE INTERPRETER:  Every time I go shopping I

6    buy it.

7    Q.    Did you have to buy it right after the

8    accident?

9         THE INTERPRETER:  No, after the medication

10   was cut off.

11   Q.    Okay.  So right after the fall, they gave

12   you medication; is that correct?

13        THE INTERPRETER:  Yes.

14   Q.    And that was Motrin or Tylenol or Ibuprofen?

15   A.    Yeah.

16        THE INTERPRETER:  Yes.

17   Q.    And that was right up until May of 2000; is

18   that correct?

19        THE INTERPRETER:  I cannot recall.  The

20   only time I recall is that when I get the prescription

21   and the medication was given to me in seven days,

22   sometimes seven day or ten days.  But when I ran out,

23   I decide for a sick call and come to see Jim Updike.

24   And he gave me, "You again?"  And then he give me

25   medication.

1          And every time I come there and I see him

2     and this time I was -- my arm was hurt, I tried to ask

3     him to give me a note to stay away from work, but he

4     said -- he refused to give it to me.

5          Q.   You did ask for layoffs from work?

6          A.   Yeah.

7          THE INTERPRETER:  Yeah.

8          Q.   Who did you ask?

9          A.   Jim Updike, Mataloni.

10         THE INTERPRETER:  James Updike, Mataloni.

11         Q.   How did you ask them?

12         A.   I say my shoulder, you know, hurt, you

13    know, when I move it, you know.

14         MR. DANG:  You got it?

15         MS. DAVIS:  Uh-huh.

16         MR. DANG:  Okay.

17         Q.   Did you make an appointment with them to

18    tell them this?

19         THE INTERPRETER:  Just go sick call and then

20    go ask.

21         Q.   Did you see Mr. Mataloni at sick call?

22         THE INTERPRETER:  Sometimes.

23         Q.   Tell me what the sick call procedure is.

24         THE INTERPRETER:  Talk to the CO in the

25    block.  I want to go to sick call tomorrow.

1    Q.    Do you fill out a form?

2    A.    No.

3          THE INTERPRETER:  No.

4    Q.    Were you ever denied an opportunity to go to

5    sick call?

6    A.    No.

7          THE INTERPRETER:  No.

8    Q.    Were you ever denied an opportunity to see

9    the doctors?

10   A.    Yeah.

11         THE INTERPRETER:  Yes.

12   Q.    When?

13         THE INTERPRETER:  I saw James Updike a few

14   times and I told him I want to see doctor, and I said

15   for stronger medication.  But he looks at me and he

16   say I'm okay, and then he sent me to the block.

17   Q.    But you never had a problem actually coming

18   to the medical department?

19         MR. DANG:  What do you mean problem?

20   Q.    Were you ever denied an opportunity to come

21   to the medical department?

22         MR. DANG:  Oh, all right.

23         THE INTERPRETER:  You mean at the block or

24   at the --

25   Q.    At the block.

1  work.  I went back to work and I worked about three

2  days, the pain really aggravated, and I just said

3  forget it.  I don't want to work.  Whatever happens

4  happens.

5       Q.  You did not go to back to work with the

6  sling on then?

7            THE INTERPRETER:  Yeah, when I went back to

8  work I had the sling on.  I was told that if I cannot

9  do heavy duty, I can do light duty.

10      Q.  How many days before you went back to work?

11           THE INTERPRETER:  I cannot recall.

12      Q.  Where did you work?

13           THE INTERPRETER:  Standing at the line.  I

14  give out butter to inmates with one hand.

15      Q.  And that's all you did?

16           THE INTERPRETER:  That was the first day.

17  The second day the guy with the blue shirt uniform, I

18  call him CO, after everybody finishing eating asked me

19  to use a mop and asked me to mop.

20      Q.  Were you able to do that?

21           THE INTERPRETER:  No.  I was threatened and

22  said if I do not do my job, I would have to go to the

23  office, talk to Mr. O'Brien.

24      Q.  Who told you that?

25           THE INTERPRETER:  I don't know his name, but

99

1    away from you, what medication was taken away from you?

2        A.    Tylenol, Ibuprofen and Motrin.

3        Q.    So that's what you're talking about?

4            THE INTERPRETER:  Yeah, Tylenol, Ibuprofen

5    and Motrin.

6        Q.    Okay.  You said you wrote to Mr. O'Brien

7    and to Mr. Mataloni.  I'm going to show you a request

8    dated May 6th, 2000.  It's called Inmate's Request to

9    Staff.  And if you would, sir, would you read that to

10   him, please.

11           Do you remember that request?

12           THE INTERPRETER:  Yes.

13       Q.    Did you have someone prepare that for you?

14           THE INTERPRETER:  Yes.

15       Q.    Is that your signature on it?

16           THE INTERPRETER:  Yes.

17       Q.    Was this right after you went back to work?

18           THE INTERPRETER:  No, before that.

19       Q.    There is before you went back to work?

20           THE INTERPRETER:  I was working like March

21   and April.  And because of this injury, the pain, I

22   said who cares, you know, whatever happens happens.

23   And then I went to sick call and James Updike and

24   asked him, you know, to give me time off and he did

25   not give it to me.  He told me that I'm okay and told

1    me to go back to work.

2        Q.    Then did you write this note?

3            THE INTERPRETER:   There was a captain, he

4    explained me to the rule of sick call and that I could

5    not just take off just like that.   If I wanted a day

6    off, I have to go to sick call and ask for a request

7    for lay-ins.

8        Q.    When did he tell you that?

9            THE INTERPRETER:   I cannot recall.   I think

10   he came to my block after.   I was really hurt, I was

11   really in pain and I just -- I quit my job and took

12   off and went back to my cell.   And then he came to my

13   cell and explained the rule of sick call.

14       Q.    When you talked to Mr. O'Brien, did he tell

15   you to go to sick call?

16           THE INTERPRETER:   No.

17       Q.    Did Mr. Hazlak tell you to go to sick call?

18           THE INTERPRETER:   No.

19       Q.    Who told you to write this request form?

20           THE INTERPRETER:   A friend who saw me fell

21   in the kitchen.

22       Q.    And how long had you been working when you

23   filled this out?

24           THE INTERPRETER:   I don't know how many days

25   before this happened.   If I'm not mistaken, it was May

101

1    3rd I refused to work.  Then the unit manager called

2    me up to talk to me and he said you don't want to

3    work, then he write me up told me to go back to

4    kitchen and work.  And then after kitchen you'll come

5    back to the block.  Clean the floor, mop the floor,

6    clean the bathroom for three days.

7         Q.   Mr. Hue, in your Inmate Request here you say

8    you are doing heavy labor.

9              THE INTERPRETER:  The first day they gave

10   me the light job and then the second day they make me

11   -- they give me the heavy duty.  And I got upset and

12   then I just left my job.

13        Q.   What do you mean by "heavy labor"?

14             THE INTERPRETER:  Like carry the heavy

15   tray.  I have to carry it five stack at a time in

16   order to supply enough for the inmates.  But if carry

17   like that, I won't be able to carry.

18        Q.   Is that what you were doing in March and

19   April?

20             THE INTERPRETER:  No, I didn't do it.

21        Q.   What were you doing in March and April?

22             THE INTERPRETER:  Butter and sugar.

23        A.   Flatware.

24             THE INTERPRETER:  Flatware.  Silverware.

25        Q.   So you were doing that kind of duty in

1  March and April?

2         THE INTERPRETER:  Yes.

3     Q.   Now, on the same day you did a request to

4  Mr. Mataloni; is that true?

5         THE INTERPRETER:  Yes.

6     Q.   And you said the same thing?

7         THE INTERPRETER:  Yes.  My point was only --

8  I'm trying to make a point to them that either give me

9  light duty or give me lay-ins.  That's all I want.

10     Q.   And you had been to the medical department

11  for lay-ins and they refused you, right?

12         THE INTERPRETER:  Yes.

13     Q.   Mr. Mataloni referred you to sign up for

14  sick call again.  Did you?

15         THE INTERPRETER:  Yes.

16     Q.   Did you ask them for a lay-in?

17     MR. DANG:  Ask Mataloni?

18     Q.   Ask the medical department for a lay-in?

19         THE INTERPRETER:  Yes.

20     Q.   Did you ask them about work restrictions?

21         THE INTERPRETER:  I only asked for lay-ins.

22     Q.   You didn't ask for any work restrictions?

23         THE INTERPRETER:  I only asked for two,

24  either give me lay-in -- I only asked for lay-ins or

25  give me light duty.

1  through the grapevine that work in the laundry make

2  more money.  So I fill out a request to work in the

3  laundry to Mr. Geiser.  And I've been here three years

4  but I don't know how he looks.  I fill it out and send

5  it in and it's been over a year or something and

6  suddenly I got a job.

7        Q.    Laundry is the best job in the prison, isn't

8  it?

9             THE INTERPRETER:  I like that because my

10  boss know that I have injury in my arm.  He give me

11  light duty, like folding clothes.

12        Q.    Laundry is the best job in the prison,

13  isn't it?

14             THE INTERPRETER:  I don't know.  All I know

15  is work longer hours, make more money.

16        Q.    It's the best-paying job in the prison;

17  isn't it?

18             THE INTERPRETER:  Maybe, maybe not.  If I

19  work 140 hours less, I would not have bonus.  But I

20  work 140 hours more, I would have bonus.

21        Q.    And you work extra hours now, don't you?

22             THE INTERPRETER:  There are months I have

23  extra hours and there are months that just borderline.

24        Q.    In addition to your pay you also get

25  incentives; is that right?

1    O'Brien did wrong?

2           MR. DANG:  He was asking me my points, so I

3    cannot answer him.  I just want to tell him to stick

4    to your questions.

5           THE INTERPRETER:  He's the manager of the

6    kitchen.  He has the authority to lay me in or give me

7    light duty.  That's it.

8       Q.   And because he didn't give you light duty

9    and because he didn't lay you in, you feel he did

10   something wrong?

11          THE INTERPRETER:  This one time when my arm

12   was still in the sling and I was in pain and the guy

13   in the blue uniform asked me -- told me to clean up

14   the whole dining room.  And I went to O'Brien to

15   complain about it but O'Brien didn't care, he didn't

16   do anything.

17      Q.   What official pressure did Mr. O'Brien put

18   on you?

19          THE INTERPRETER:  Okay.  He told me that I

20   have to work and if I don't work, I have to get a

21   ticket, write-up.

22      Q.   You would have to get a write-up from the

23   medical people?

24          THE INTERPRETER:  The write-up from Mr.

25   O'Brien.

125

1    Q.    Oh, you would get a write-up from him?

2    THE INTERPRETER:  Yes.

3    Q.    He threatened you with a misconduct?

4    THE INTERPRETER:  Yes.

5    Q.    And that's because medical told him there

6    was no reason you could not work; is that right?

7    THE INTERPRETER:  That I don't know.

8    Q.    You don't know.  What about Mr. Hazlak, what

9    did he do?

10    THE INTERPRETER:  Mr. Hazlak like if I

11    don't -- he give me two choice.  Either I go back to

12    work or I have to pack up and go to block, as I told

13    you earlier.

14    Q.    Is that the only instance Mr. Hazlak, as

15    you allege, forced you to work?

16    THE INTERPRETER:  There's many others.  He

17    writed me a few other write-ups.  Some of them dropped

18    and then he pick it up and then write me another one.

19    Q.    I don't understand.

20    THE INTERPRETER:  Like you said, I have

21    another write-up and then small stuff.  And the office

22    down here, they call me up for a hearing and they

23    dismissed.  And I come back to my block, the unit

24    manager called me up and write me up another write-up.

25    Q.    Do you have copies of these misconducts?

126

1        THE INTERPRETER:  Yes.

2   Q.   And you will send me those?

3        THE INTERPRETER:  Yes.

4   Q.   And what about Mataloni?

5        MR. DANG:  What is it?

6   Q.   Mr. Mataloni, what did he do?

7        THE INTERPRETER:  I met him so many times

8   down here, I beg him every time.  I came and asked him

9   when do I see the bone doctor, and he told me okay, be

10  patient, patient.  I beg him to lay me in, but he did

11  not, he refused.

12       Q.   Is your only real complaint that you didn't

13  see a bone doctor?

14       THE INTERPRETER:  Yes.

15       Q.   If a bone doctor had said to you, there's

16  nothing wrong with you, just continue to do your

17  exercises, go back to work, would you have been

18  satisfied?

19       MR. DANG:  Okay.  Just answer the question.

20       Q.   Mr. Hue, one question at a time.  Okay?  So

21  just answer the question I asked.

22       THE INTERPRETER:  Yes, I would agree.

23       Q.   Do you believe Mr. Mataloni could have

24  overruled the medical doctors?

25       THE INTERPRETER:  I don't know what you are

1    trying to say with that question.

2        Q.    I'm asking you if you think Mr. Mataloni

3    could overrule the medical doctors' decisions.

4            THE INTERPRETER:  He's the chief medical.

5    He know what's my problem on my shoulder.  He know my

6    problem from the beginning.  He doesn't know.

7        Q.    Okay.  Mr. Hue, here's my question.  Do you

8    believe Mr. Mataloni can tell the medical doctors what

9    to do?

10           THE INTERPRETER:  I don't know.

11       Q.    You don't know.  Mr. Hue, what is your

12   serious risk?  What was the risk to you not to see a

13   bone specialist?

14           THE INTERPRETER:  The first thing is that I

15   don't want to be handicapped like this for the rest of

16   my life.  Secondly, I'm staying in jail.  If there are

17   things -- problem arise, I will be able to have two

18   hands to defend myself.  And the thing is I just want

19   to be known like others and be able to run and play

20   other things.  That's it.

21       Q.    What risk to your health existed after this

22   injury in 2000?

23           MR. DANG:  2000?

24       Q.    2000.

25           THE INTERPRETER:  As I said, my arm was

128

1  hurt and when I sleep I lean against it, it hurt me.

2  And the way it hurt, I wake up and I lost sleep and

3  the morning I was not myself, like a crazy person.

4  And my mind was not strong or clear.

5       Q.   Mr. Hue, correct me if I'm wrong.  If this

6  is not true, tell me, okay?

7            THE INTERPRETER:  Okay.

8       Q.   If in fact, we were to let you see a bone

9  specialist, regardless of what that bone specialist

10 says, you would be happy?

11           THE INTERPRETER:  I would be happy.  But if

12 the diagnosis is that I have a broken bone, will the

13 facility help me to pay for the surgery or not?

14      Q.   Okay.  That wasn't my question.  But that's

15 all you really want is to see a bone specialist; is

16 that right?

17           THE INTERPRETER:  Yes.

18           MS. DAVIS:  Thank you.  I have no further

19 questions.

20           MR. BUTKOVITZ:  I have no questions.

21                   + + + + + +

22      (The Deposition concluded at 5:05 p.m.)

23

24

25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHAN HUE,                          :
                                   :
      Plaintiff,                   :        Civil No. 01-CV-1064
                                   :
      v.                           :        (Judge Kane)
                                   :
JAMES UPDIKE, et al.,              :        (Magistrate Judge Smyser)
                                   :
      Defendants.                  :

## CERTIFICATE OF SERVICE

I hereby certify that I am this day depositing in the U.S. mail a true and correct copy of Defendants' Exhibits in Support of Corrections Defendants' Brief in Support of Motion for Summary Judgment on the Facts in the above-referenced matter.

### Service by first-class mail addressed as follows:

Phan Hue, DY 0577                  Alan Gold, Esquire (Sent Via ECF Only)
SCI-Retreat                        Monaghan & Gold, P.C.
660 State Route 11                 7837 Old York Road
Hunlock Creek, Pa. 18621           Elkins Park, PA  19027

                                   s/ Marilyn Wright
                                   Marilyn Wright
                                   Clerk Typist 2

Department of Corrections
Office of Chief Counsel
55 Utley Drive
Camp Hill, PA  17011
(717) 731-0444
Dated:  April 11, 2003